**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br><br>   - v. -<br><br><br><br>MICHAEL SHVARTSMAN,<br>GERALD SHVARTSMAN, and<br>BRUCE GARELICK,<br>                      Defendants. | Case No.: 23-CR-307 (LJL) |

<u>**DEFENDANT BRUCE GARELICK'S MOTION TO SUPPRESS**</u>
<u>**AND FOR A BILL OF PARTICULARS**</u>

Alexandra A.E. Shapiro
Jonathan P. Bach
Alice Buttrick
Shapiro Arato Bach LLP
1140 Avenue of the Americas, 17th Floor
New York, New York 10036
(212) 257-4880
ashapiro@shapiroarato.com
jbach@shapiroarato.com
abuttrick@shapiroarato.com

*Attorneys for Bruce Garelick*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................. ii

INTRODUCTION .......................................................................................... 1

ARGUMENT ................................................................................................. 2

I.   THE COURT SHOULD SUPPRESS GARELICK'S UNLAWFULLY OBTAINED
     TESTIMONIAL STATEMENTS AND THE FRUITS THEREOF ....................................... 2

     A.  Background ........................................................................................ 2

     B.  Law Enforcement Officials Violated Garelick's Right
         Against Self-Incrimination ................................................................... 6

         1.   The Password Was Testimonial And Incriminating ..................................... 6

         2.   The Government Coerced Garelick Into Disclosing
              His Password .............................................................................. 9

     C.  The Fruit Of Garelick's Coerced Statements Should Be Suppressed ............................... 14

     D.  The Government Must Disclose Garelick's Other Statements ......................................... 16

     E.  In The Alternative, A Hearing Is Warranted ..................................................... 16

II.  THE GOVERNMENT SHOULD BE REQUIRED TO PROVIDE
     A BILL OF PARTICULARS ........................................................................ 17

     A.  The Government Should Be Required To Identify The
         Alleged Co-Conspirators And Tippees ......................................................... 17

     B.  The Government Should Be Required To Identify The Material
         Non-Public Information Garelick Allegedly Shared ........................................... 20

     C.  The Government Should Be Required To Identify The Trades At Issue ............................ 21

     D.  The Government's Voluminous Production Does Not Provide Fair Notice ....................... 22

III. THE COURT SHOULD ORDER THE DEFENDANTS'
     PROPOSED SCHEDULE ......................................................................... 23

CONCLUSION ............................................................................................ 23

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Commonwealth v. Baust,*
   89 Va. Cir. 267 (2014) ........................................................................................ 8

*Commonwealth v. Davis,*
   656 Pa. 213 (2019) ............................................................................................. 8

*Doe v. United States,*
   487 U.S. 201 (1988) ........................................................................................... 8

*G.A.Q.L. v. State,*
   257 So. 3d 1058 (Fla. Dist. Ct. App. 2018) ..................................................... 8

*Kastigar v. United States,*
   406 U.S. 441 (1972) ......................................................................................... 14

*Matter of Residence in Oakland, California,*
   354 F. Supp. 3d 1010 (N.D. Cal. 2019) .......................................................... 8

*Miranda v. Arizona,*
   384 U.S. 436 (1966) ........................................................................................... 6

*Ohio v. Reiner,*
   532 U.S. 17 (2001) ............................................................................................. 6

*Schneckloth v. Bustamonte,*
   412 U.S. 218 (1973) ........................................................................................... 9

*Seo v. State,*
   148 N.E.3d 952 (Ind. 2020) .............................................................................. 9

*State v. Valdez,*
   -- P.3d --, 2023 UT 26 (Utah 2023) ................................................................. 8

*Thompson v. Keohane,*
   516 U.S. 99 (1995) ........................................................................................... 11

*United States v. Ali,*
   86 F.3d 275 (2d Cir. 1996) .............................................................................. 12

*United States v. Allocco*, 801 F. Supp. 1000, (E.D.N.Y. 1992),
   *aff'd*, 29 F.3d 620 (2d Cir. 1994) ................................................................... 18

*United States v. Anderson,*
  929 F.2d 96 (2d Cir. 1991) ................................................................. 10, 17

*United States v. Biaggi,*
  909 F.2d 662 (2d Cir. 1990) ................................................................. 16

*United States v. Bin Laden,*
  92 F. Supp. 2d 225 (S.D.N.Y. 2000) .................................................... 22

*United States v. Bortnovsky,*
  820 F.2d 572 (2d Cir. 1987) ................................................................. 22

*United States v. D'Amelio,*
  683 F.3d 412 (2d Cir. 2012) ................................................................. 22

*United States v. Davidoff,*
  845 F.2d 1151 (2d Cir. 1988) ............................................................... 17

*United States v. Duvall,*
  537 F.2d 15 (2d Cir. 1976) ................................................................... 10

*United States v. Failla,*
  1993 WL 547419 (E.D.N.Y. Dec. 21, 1993) ....................................... 18

*United States v. FNU LNU,*
  653 F.3d 144 (2d Cir. 2011) ........................................................... 11, 12

*United States v. Fox,*
  721 F.2d 32 (2d Cir. 1983) ................................................................... 9

*United States v. Gilkeson,*
  431 F. Supp. 2d 270 (N.D.N.Y. 2006) ................................................. 14

*United States v. Green,*
  272 F.3d 748 (5th Cir. 2001) ............................................................... 8

*United States v. Greenfield,*
  831 F.3d 106 (2d Cir. 2016) ................................................................. 9

*United States v. Grunewald,*
  987 F.2d 531 (8th Cir. 1993) ............................................................... 13

*United States v. Haak,*
  884 F.3d 400 (2d Cir. 2018) ............................................................ 9, 12

*United States v. Hubbell,*
  530 U.S. 27 (2000) ........................................................................ 6, 7, 14

*United States v. Kahale*,
   789 F. Supp. 2d 359 (E.D.N.Y. 2009),
   *aff'd sub nom. United States v. Graham*, 477 F. App'x 818 (2d Cir. 2012) ............................ 18

*United States v. Kirschner*,
   823 F. Supp. 2d 665 (E.D. Mich. 2010) ................................................................................ 8

*United States v. Luna*,
   2006 WL 1668006 (D. Conn. May 17, 2006) ...................................................................... 22

*United States v. McKee*,
   192 F.3d 535 (6th Cir. 1999) .............................................................................................. 13

*United States v. Mendonca*,
   -- F.4th --, 2023 WL 8441319 (2d Cir. Dec. 6, 2023) ........................................................ 11

*United States v. Mitchell*,
   76 M.J. 413 (C.A.A.F. 2017) .............................................................................................. 14

*United States v. Mitchell*,
   966 F.2d 92 (2d Cir. 1992) ................................................................................................. 10

*United States v. Nacchio*,
   2006 WL 2475282 (D. Colo. Aug. 25, 2006) ...................................................................... 21

*United States v. Nachamie*,
   91 F. Supp. 2d 565 (S.D.N.Y. 2000) ................................................................................... 20

*United States v. Okwumabua*,
   828 F.2d 950 (2d Cir. 1987) ............................................................................................... 10

*United States v. Patane*,
   542 U.S. 630 (2004) ........................................................................................................... 14

*United States v. Pena*,
   961 F.2d 333 (2d Cir. 1992) ............................................................................................... 17

*United States v. Peters*,
   153 F.3d 445 (7th Cir. 1998) .............................................................................................. 13

*United States v. Pinto-Thomaz*,
   352 F. Supp. 3d 287 (S.D.N.Y. 2018) ............................................................................. 8, 14

*United States v. Rajaratnam*,
   2010 WL 2788168 (S.D.N.Y. July 13, 2010) .......................................................... 20, 21, 22

*United States v. Reilly*,
   76 F.3d 1271 (2d Cir.), *on reh'g*, 91 F.3d 331 (2d Cir. 1996) ............................................ 15

iv

*United States v. Rodriguez*,
   496 F.3d 221 (2d Cir. 2007) ............................................................................ 16

*United States v. Rogozin*,
   2010 WL 4628520 (W.D.N.Y. Nov. 16, 2010) ..................................................... 8

*United States v. Taylor*,
   745 F.3d 15 (2d Cir. 2014) .............................................................................. 12

*United States v. Tweel*,
   550 F.2d 297 (5th Cir. 1977) ........................................................................... 13

*United States v. Wozniak*,
   126 F.3d 105 (2d Cir. 1997) ............................................................................ 22

*United States v. Yilmaz*,
   508 F. App'x 49 (2d Cir. 2013) ........................................................................ 11

**Statutes**

Federal Rule of Criminal Procedure 7 ...................................................................... 1, 17

Federal Rule of Criminal Procedure 16 ....................................................................... 16

## <u>INTRODUCTION</u>

Defendant Bruce Garelick respectfully submits this memorandum of law in support of his motion to suppress materials and for a bill of particulars.

*First*, the government coerced Garelick into disclosing the password to his cellphone, a testimonial statement, in violation of his Fifth Amendment rights.  In December 2021, the government executed a search warrant for Garelick's phone when Garelick passed through John F. Kennedy Airport.  But Garelick never knew, because government agents actively misled Garelick into believing he had been stopped as part of a routine search.  During an extended detention, law enforcement agents used this pretext to question Garelick about key people and entities in this case.  The government also tricked Garelick into disclosing his phone password, so they could access its contents.  The government's affirmative misrepresentations rendered Garelick's statements involuntary and inadmissible.  Subsequently, in an apparent effort to hide its misconduct, the government told a magistrate judge that it did *not* have the passcode, even though days later, an FBI agent crowed to Garelick himself that the government *did* have Garelick's passcode, because he disclosed it at the border.  And the government relied on Garelick's ill-gotten password, and the materials it obtained using the passcode, to support and execute numerous warrants for additional materials in the case.  Garelick's statements, and the fruits of those statements, must be suppressed.

*Second*, Garelick moves for a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f).  Given the immense volume of discovery and the ambiguity of the Indictment, Garelick is left to guess at the contours of the charges against him.  The government should be required to identify any alleged unindicted co-conspirators or tippees and the material non-public information Garelick allegedly provided—just as the government has agreed or been ordered to do in many other cases charging insider trading and financial fraud.  In addition, the government

must advise Garelick of the specific trades at issue, especially given that the Indictment and discovery discuss trades that are not charged. Garelick needs such notice to adequately prepare for trial.

*Third*, the parties have discussed a proposed schedule for pre-trial disclosures but have not been able to reach agreement. On behalf of all Defendants, Garelick respectfully requests that the Court order the schedule proposed below, which appropriately balances the obligations of the government and defense counsel. Separately, Garelick notes that the government provided a new production, consisting of more than 20,000 pages of materials, on December 8, 2023, shortly before these motions were due. Counsel is still in the process of reviewing those materials and reserves the right to file additional motions arising from that discovery if needed.

## ARGUMENT

## I.   THE COURT SHOULD SUPPRESS GARELICK'S UNLAWFULLY OBTAINED TESTIMONIAL STATEMENTS AND THE FRUITS THEREOF

### A.   Background

In June 2023, the government charged Garelick and his co-defendants in a ten-count indictment, alleging they committed insider trading and securities fraud. (Dkt. 1). The charges arose from defendants' involvement with a special purpose acquisition corporation ("SPAC") named Digital World Acquisition Corporation ("DWAC"), which, in October 2021, entered into an agreement to merge with a media company owned by former President Donald Trump.

The government's criminal investigation was well underway by the end of 2021. On December 29, 2021, the government obtained a warrant to search a phone in Garelick's possession, as well as permission to delay disclosing the existence of the warrant for one year. (Declaration of Alexandra A.E. Shapiro ("Shapiro Decl."), Ex. 1). The warrant authorized the government to seize various materials from the phone, including: "Evidence sufficient to

establish the user of the Subject Device" and "evidence of passwords or other information need to access the Subject Device." (*Id.* at SDNY_01_00818987-88).

To access the phone's contents, the warrant application expressly stated that it did *not* seek authority "to compel Garelick to provide a numeric password." (*Id.* at SDNY_01_00819014 ¶16). The warrant accordingly authorized the use of Garelick's biometric characteristics "for the purpose of attempting to unlock the device in order to search the contents," but it did not permit agents to compel Garelick to disclose a password. (*Id.* at SDNY_01_00818986).

On the night of December 31, 2021, the government covertly executed the warrant at John F. Kennedy Airport, intercepting Garelick under the guise of a routine customs stop as he returned home from a vacation with his girlfriend. (*See* Shapiro Decl., Ex. 2). The agent at the initial customs window informed Garelick that he had been flagged for secondary screening. (Declaration of Bruce Garelick ("Garelick Decl."), ¶ 2). Garelick had never been stopped for secondary screening by customs agents before. (*Id.* ¶ 3). Garelick was separated from his girlfriend and taken to a holding room where he was questioned by at least two agents, who appeared to be armed. (*Id.* ¶¶ 4-5). An image the government produced in discovery indicates that agents took Garelick's passport and photographed it. (Shapiro Decl. Ex. 3). In total, Garelick was held for approximately two hours, without being offered food or water. (Garelick Decl. ¶¶ 17, 18). For much of that time, Garelick also had no access to his phone and was separated from his travelling companion. (*Id.* ¶¶ 13-15).

Garelick repeatedly asked why he was being questioned. (*Id.* ¶¶ 6, 8)). The agents told him he was the subject of a routine customs search. (*Id.*). Of course, that was false: Garelick was held and questioned in furtherance of a deliberately planned criminal investigation into a

domestic insider trading scheme.  And that's where the agents' questions went.  Under the pretense that they had looked up some information about Garelick online, the agents asked Garelick about DWAC and its CEO Patrick Orlando, as well as Garelick's boss, Michael Shvartsman, with whom Garelick allegedly carried out the charged scheme.  (*Id.* ¶ 7).  When Garelick asked why the agents were asking about these topics, the agents reiterated that their questions were routine.  (*Id.* ¶ 8).

After about thirty minutes of questioning, the agents asked Garelick to show them his phone.  (*Id.* ¶ 9).  Garelick asked why, and the agents again told him that this was a routine aspect of the screening.  (*Id.*).  The agents then asked Garelick for his phone password.  (*Id.* ¶ 10).  When he asked why they needed it, they again told him this, too, was routine.  (*Id.*).  Garelick answered the agents' questions and provided the password because he felt pressure to cooperate with the agents and answer their questions so that they would let him go.  (*Id.* ¶ 11).  Garelick would not have disclosed his password or answered any questions if he had known he was the subject of a criminal investigation or if he felt he would have been allowed to leave without disclosing that information.  (*Id.* ¶ 12).

The agents then took Garelick's phone away for approximately 1.5 hours.  (*Id.* ¶ 13).  The FBI's contemporaneous notes indicate that agents "verified [the] passcode" of the phone.  (Shapiro Decl. Ex. 4).  The agents also memorialized the passcode in their note.  (*Id.*).  The notes further reveal that two FBI agents scrolled through various apps on the phone and photographed materials that the government deemed responsive to the warrant.  (Shapiro Decl. Exs. 2, 4).  An agent also unsuccessfully attempted to extract the entire contents of the phone.  (Shapiro Decl. Ex. 4).  While the search was ongoing, one agent continued to question Garelick about DWAC, Orlando, and Michael Shvartsman.  (Garelick Decl. ¶ 14).  After another hour or so, Garelick's

girlfriend was permitted to join him in the holding room.  (*Id.* ¶ 15).  Around thirty minutes later, the phone was returned to Garelick, and he and his girlfriend were permitted to leave.  (*Id.* ¶ 16).

In June 2022, the FBI obtained another warrant to search and seize Garelick's phone. (Shapiro Decl. Ex. 5).  The application for that warrant, however, obscured the government's prior misconduct.  It asserted—falsely—that "[t]he passcode or password that would unlock the device subject to search under this warrant currently is not known to law enforcement."  (*Id.* at SDNY_01_00819317, ¶24(f)).  Moreover, the application continued to affirm that the government could not coerce Garelick into disclosing a password:  Like the prior application, it expressly declined to seek the authority "to compel the device owner to provide a numeric passcode" for the phone.  (*Id.* at SDNY_01_00819315, ¶24).  And it again included in the list of items to be seized "[e]vidence of passwords or other information needed to access the Subject Device."  (*Id.* at SDNY_01_00819326).  While executing the June 2022 warrant, however, one agent bragged to Garelick that the FBI already had his password because Garelick had given it to agents at the border in New York.  (Garelick Decl. ¶ 19).

The government used the password, as well as the materials found on Garelick's phone, to support additional, covert warrants.  For instance, February and May 2022 applications for warrants to search Garelick's Gmail and Apple accounts, along with those of other witnesses and defendants, asserted there was probable cause to search the accounts based on screenshots of "text messages, calendar entries, and contact information" law enforcement agents obtained from Garelick's phone at the border.   (Shapiro Decl. Ex. 6 at SDNY_01_000819053-63 & n.13;[1] Ex. 9 at SDNY_01_00819203-07).

---

[1] Two other February 2022 warrant applications incorporated and relied on the same affidavit. (*See* Shapiro Decl. Ex. 7 at SDNY_01_00818905, Ex. 8 at SDNY_01_00818924).

Finally, although the cell phone search played a substantial role in the government's investigation, the government did not notify Garelick about the border search warrant by December 29, 2022, as that warrant directed.  (Garelick Decl. ¶ 20; Shapiro Decl. Ex. 1 at SDNY_01_00818984).

### B.  Law Enforcement Officials Violated Garelick's Right Against Self-Incrimination

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself."  To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled.  *See United States v. Hubbell*, 530 U.S. 27, 34-38 (2000).  Garelick's disclosure of his password under coercive circumstances concocted by the government to trick him into assisting its criminal investigation easily satisfies all three prongs.[2]

### 1.  The Password Was Testimonial And Incriminating

A communication is testimonial if it requires the speaker to communicate "the contents of his own mind."  *Hubbell*, 530 U.S. at 43.  And, in accordance with the "liberal construction" consistently accorded to the Fifth Amendment privilege against self-incrimination, *Miranda v. Arizona*, 384 U.S. 436, 461 (1966), the Supreme Court recognizes that privilege extends not only to statements that are directly incriminatory but also to those that, while not themselves inculpatory, "would furnish a link in the chain of evidence needed to prosecute the claimant." *Ohio v. Reiner*, 532 U.S. 17, 20 (2001) (per curiam).  Under these well-known principles, there can be no question that coercing someone into disclosing the password to a device believed to contain evidence of crimes is a testimonial and incriminating act.

Indeed, the government effectively conceded that a password is testimonial by expressly

---

[2] Unless otherwise noted, citations include emphasis but omit quotation marks, footnotes, and alterations in the original source.

declining to seek authority to compel Garelick to disclose it in its warrant application—

presumably, because the government believed it could not lawfully do so.  (*See* Shapiro Decl.

Ex. 1 at SDNY_01_00819014 ¶16).  The same application also made clear that the government

viewed the password as incriminating, or at a minimum, a necessary "link in the chain of

evidence needed" for its prosecution:  it described "[e]vidence sufficient to establish the user of

the Subject Device" and "evidence of passwords or other information needed to access" that

device as the "evidence, fruits, and instrumentalities" of the criminal violations under

investigation.  (*Id.* at SDNY_01_00818987-88).

Caselaw also firmly supports the conclusion that communicating a password is

testimonial.  Justice Stevens said as much in *United States v. Hubbell*, a seminal case holding

that forced acts of production—there, an order compelling a defendant to assemble documents in

response to a grand jury subpoena—violated the Fifth Amendment privilege against self-

incrimination.  530 U.S. at 45.  Writing for the majority, Justice Stevens explained: "It was

unquestionably necessary for respondent to make extensive use of the contents of his own mind

in identifying the hundreds of documents responsive to the requests in the subpoena…The

assembly of those documents was like telling an inquisitor the combination to a wall safe, not

like being forced to surrender the key to a strongbox."  *Id.* at 43.  This comment referred to

Justice Stevens' observation in a prior dissent that, under the Fifth Amendment, a person might

be "forced to surrender a key to a strongbox containing incriminating documents, but I do not

believe he can be compelled to reveal the combination to his wall safe—by word or deed."  *Doe*

*v. United States*, 487 U.S. 201, 219 (1988); *see also id.* at 210 n.9 (majority op., agreeing this

distinction is sound).

A password, of course, is the modern-day equivalent of a wall safe combination.  Relying

on *Hubbell*'s analogy, numerous courts have "found that a passcode cannot be compelled under the Fifth Amendment, because the act of communicating the passcode is testimonial, as '[t]he expression of the contents of an individual's mind falls squarely within the protection of the Fifth Amendment.'"  *Matter of Residence in Oakland, California*, 354 F. Supp. 3d 1010, 1015 (N.D. Cal. 2019) (quoting *Doe*, collecting cases); *see also State v. Valdez*, -- P.3d --, 2023 UT 26, ¶ 51 (Utah 2023) (passcode is testimonial because it "explicitly communicates information from the suspect's own mind"); *United States v. Kirschner*, 823 F. Supp. 2d 665, 668-69 (E.D. Mich. 2010) (The government "is seeking testimony from the Defendant, requiring him to divulge through his mental processes his password—that will be used to incriminate him," discussing *Hubbell* and *Doe*); *Commonwealth v. Davis*, 656 Pa. 213, 235 (2019) (same); *G.A.Q.L. v. State*, 257 So. 3d 1058, 1061-62 (Fla. Dist. Ct. App. 2018) (same); *Commonwealth v. Baust*, 89 Va. Cir. 267 (2014) (same).  While the Second Circuit has not directly addressed this issue, district courts in this Circuit have concluded that passwords are testimonial because they disclose information from the contents of the defendant's mind.  In *United States v. Pinto-Thomaz*, for instance, Judge Rakoff indicated that disclosure of a phone passcode was akin to compelling a suspect to "open[] the combination locks" on a locked case, which act was "testimonial and communicative in nature."  352 F. Supp. 3d 287, 311 (S.D.N.Y. 2018) (discussing, *inter alia*, *United States v. Green*, 272 F.3d 748 (5th Cir. 2001)); *see also United States v. Rogozin*, 2010 WL 4628520, at *5-6 (W.D.N.Y. Nov. 16, 2010) ("defendant's statement [disclosing] the password was testimonial in nature…it requires Defendant to communicate 'knowledge,'" quoting *Kirschner*).

The disclosure of a password also triggers the Fifth Amendment privilege because it "implicitly communicates, at a minimum, three things:  (1) the suspect knows the password; (2)

the files on the device exist; and (3) the suspect possessed those files." *Seo v. State*, 148 N.E.3d 952, 957-58 (Ind. 2020). As the Second Circuit has explained, even the mere production of documents can be testimonial, incriminating, and therefore subject to Fifth Amendment protections, because that act "necessarily communicates the existence, control and authenticity of the documents at the time of production." *United States v. Greenfield*, 831 F.3d 106, 124 (2d Cir. 2016); *see also United States v. Fox*, 721 F.2d 32, 36-37 (2d Cir. 1983) (compelled compliance with an IRS summons violated the Fifth Amendment because defendant would be "forced (1) to acknowledge the existence of records of which the government was unaware, and (2) to implicitly authenticate the records as his own").

### 2.   The Government Coerced Garelick Into Disclosing His Password

To pass muster under the Fifth Amendment, incriminating, testimonial statements must be "voluntary, *i.e.*, the 'product of an essentially free and unconstrained choice by their maker,'" and not "coerced by police activity." *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973)). A statement is not voluntary if, "under the totality of the circumstances[,] the defendant's will was overborne by the police conduct." *Id.* Here, the police-dominated conditions at the border combined with the agents' affirmatively deceptive conduct over the course of two hours in a manner that was designed to—and did—violate Garelick's Fifth Amendment rights.

The Second Circuit recognizes that "[a]ffirmative misrepresentations by the police may be sufficiently coercive to invalidate a suspect's waiver of the Fifth Amendment privilege." *United States v. Anderson*, 929 F.2d 96, 100 (2d Cir. 1991) (provision of false legal advice to uncounseled defendant warranted suppression); *United States v. Duvall*, 537 F.2d 15, 24-25 (2d Cir. 1976) (same). Garelick has offered sufficient evidence to "prevail on [such] a claim of

trickery and deception" because his affidavit shows that the agents "affirmatively misled him as to the true nature of their investigation." *United States v. Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992). This is not a case like *Mitchell* itself, in which there was no Fifth Amendment violation when an agent "made clear that he was a criminal investigator" and simply "deemphasized, but did not misrepresent, the criminal nature of the inquiry," *id.* at 100-01; or like *United States v. Okwumabua*, where there was no violation because "[n]o inquiries were made by the defendant as to the identity of the agent or his purpose in conducting the interview," 828 F.2d 950, 953 (2d Cir. 1987). Rather, Garelick asked the agents repeatedly why he was being questioned, and in response, they falsely reassured him that the interview was routine, when it was, to the contrary, a premeditated effort to further a criminal investigation against him. (Garelick Decl. ¶¶ 6-10).[3] Had Garelick known the truth, he would have contacted a lawyer or refused to disclose the password. (*Id.* ¶ 12). The agents' false reassurances were deliberately designed to overcome such anticipated resistance, and to evade the government's inability to obtain lawful authority to force Garelick to disclose his password.

Moreover, their falsehoods exploited the environment in which Garelick was questioned. Garelick answered the agents' questions and provided his password because he felt pressured to cooperate so that he would be allowed to leave. (Garelick Decl. ¶ 11). Again, had agents approached Garelick at his home or office with questions about his cell phone password, Garelick would have declined to let them in, or called a lawyer, or simply refused to answer. But having never been stopped in customs before, Garelick did not know what to expect during the secondary screening. (Garelick Decl. ¶ 3); *see also United States v. Mendonca*, -- F.4th --, 2023

---

[3] The warrant permitted the government to execute the search covertly. But that did not grant the government free rein to lie to Garelick to coerce him into making testimonial statements to facilitate the search.

WL 8441319, at *19 n.21 (2d Cir. Dec. 6, 2023) (although defendant was an "educated professional who appeared perfectly cogent," his "inexperience with the mechanics of the criminal justice system left him more vulnerable to police bluster and deception than other suspects may have been in his place").

Indeed, the circumstances of Garelick's interrogation were sufficiently intimidating as to constitute a "custodial" interrogation triggering his *Miranda* rights.  As the Second Circuit acknowledges, a reasonable person subjected to secondary questioning at the border would not believe he was free to go, because he "was not, in fact, free to go."  *United States v. FNU LNU*, 653 F.3d 144, 154-55 (2d Cir. 2011); *see also United States v. Yilmaz*, 508 F. App'x 49, 52 (2d Cir. 2013) (suspect subjected to secondary inspection "was not free to leave").  That alone should suffice.  Garelick recognizes that in *FNU LNU*, the Second Circuit decided that border interrogations are not necessarily custodial even where a reasonable person would not feel free to leave, and this Court is bound by that ruling.  He nevertheless reserves the right to challenge that case as inconsistent with the Supreme Court's well-established rule that *Miranda* rights attach if "a reasonable person" would have "felt he or she was not at liberty to terminate the interrogation and leave."  *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

Regardless, the circumstances under which Garelick was questioned were custodial, even under *FNU LNU*'s specialized border test.  *FNU LNU* emphasized that the custodial inquiry at the border often turns on whether a reasonable person would view the proceedings as "par for the course of entering the country from abroad," and that "the nature of the questions asked" is "especially" important.  653 F.3d at 153-55; *see also id.* at 156 (Jacobs, C.J., concurring that "the *most* important factor in determining whether *Miranda* applies at our borders will often be the objective function of an inspector's questions").  The questioning here strayed far from ordinary

11

immigration concerns—agents asked Garelick pointed questions about his boss and his business and sought access to his phone even though there was no indication Garelick used it for border-related offenses.  And the other circumstances of Garelick's questioning, too, were highly intimidating.  He was taken out of the ordinary flow of travelers for two hours at night on New Year's Eve.  He was questioned by armed agents, and, for at least some period, deprived of access to his passport, phone, and travelling companion.  *FNU LNU* observed that comparable facts "militate in favor of finding [the circumstances] 'custodial.'"  653 F.3d at 154-55; *see also United States v. Ali*, 86 F.3d 275, 276-77 (2d Cir. 1996) (interrogation custodial, meriting suppression, where defendant "was asked to step away from the boarding area, his travel documents were removed, and he was surrounded by seven officers with visible handguns").

But this Court need not find a formal *Miranda* violation to conclude that Garelick's statements were coerced.  *See United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) (irrespective of whether there was a *Miranda* violation, statement not voluntary "when obtained under circumstances that overbear the defendant's will at the time").  As noted, the inquiry looks at the totality of the circumstances.  *Haak*, 884 F.3d at 409.  Thus, the Court must consider how a reasonable person would have reacted to being questioned during a supposedly "routine" secondary screening in the limbo of JFK's border control.

The circumstance is highly analogous to cases in which the IRS conducts what purports to be a "routine" civil audit to further a criminal investigation.  Circuit courts around the country recognize that, given the inherent pressure to comply with any IRS inquiry, that type of deception is coercive and merits suppression.  *See United States v. McKee*, 192 F.3d 535, 542 (6th Cir. 1999) ("generally an affirmative misrepresentation by an IRS agent that the investigation is routine when in fact it is a criminal investigation requires suppression of

12

evidence"); *United States v. Peters*, 153 F.3d 445, 456 (7th Cir. 1998) ("A consensual search is…violative of the due process clause of the Fifth Amendment if the consent was induced by fraud, deceit, trickery or misrepresentation by the revenue agents.").  As the Eighth Circuit explained in one such case:  "It would be a flagrant disregard of individuals' rights to deliberately deceive, or even lull, taxpayers into incriminating themselves during an audit when activities of an obviously criminal nature are under investigation."  *United States v. Grunewald*, 987 F.2d 531, 534 (8th Cir. 1993); *see also United States v. Tweel*, 550 F.2d 297, 299 (5th Cir. 1977) (failure to disclose that IRS investigation was at the behest of DOJ "was a sneaky deliberate deception by the agent…and a flagrant disregard for appellant's rights").

The same principle applies here.  As demonstrated by its own warrant applications, the government was well-aware that the Fifth Amendment precluded it from compelling Garelick to disclose his password.  The government cannot evade that limitation, and "flagrant[ly] disregard" Garelick's Fifth Amendment rights, by using false reassurances from customs agents to trick Garelick into making statements that furthered the criminal investigation against himself.

Finally, the government compounded the illegality of their conduct by failing to fully disclose what had occurred at the border in its subsequent application for a warrant to search Garelick's phone.  Specifically, the government did not disclose that agents coerced Garelick into disclosing the password to the phone under false pretenses, instead claiming that the password "currently is not known to law enforcement."  (Shapiro Decl. Ex. 5 at SDNY_01_00819317, ¶24(f)).  That was false:  the passcode was recorded in an FBI note dated January 5, 2022, months before the second warrant application.  (Shapiro Decl. Ex. 4).  But the government obfuscated to avoid having to make an *ex parte* disclosure to a magistrate judge admitting that its agents violated Garelick's Fifth Amendment rights.

13

### C. The Fruit Of Garelick's Coerced Statements Should Be Suppressed

The Fifth Amendment not only protects the individual's compelled statements, but also "prohibits the prosecutorial authorities from using the compelled testimony in any respect." *Kastigar v. United States*, 406 U.S. 441, 453 (1972); *see also Hubbell*, 530 U.S. at 38. Defendants—like Garelick—who are "subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial." *United States v. Patane*, 542 U.S. 630, 640 (2004).[4]  Consequently, both the contents of Garelick's phone and the materials obtained using warrants that relied on the contents of his phone must be suppressed.

Several courts have suppressed the entire contents of a device in the analogous context where an officer presses a suspect to provide information to access to a device after the suspect invokes *Miranda* rights.  *See United States v. Gilkeson*, 431 F. Supp. 2d 270, 281-82, 294 (N.D.N.Y. 2006); *United States v. Mitchell*, 76 M.J. 413, 419-20 (C.A.A.F. 2017) (relying in part on the Military Rules of Evidence); *see also Pinto-Thomaz*, 352 F. Supp. 3d at 311 (ordering a hearing to determine whether defendant requested an attorney before his password was elicited, thereby requiring suppression of the contents of his phone).  The court in *Gilkeson* observed that suppression was especially appropriate in such circumstances because the police conduct at issue "implicates the deterrence rationale" for exclusion.  431 F. Supp. 2d at 292.

Deterrence is also important here.  There is every indication the government was deliberately trying to skirt both the Fifth Amendment itself and *Miranda*'s prophylactic rule. The initial border search warrant application concedes that the government was not seeking— and could not get—permission to compel Garelick to disclose his password.  And had the agents

---

[4] A plurality in *Patane* held "mere failures to warn" defendants of their *Miranda* rights do not always require suppression.  *Id.* at 637.  But that is not this case.

answered Garelick's questions about why they wanted his password honestly, the conversation almost certainly would have ended.  So they lied, and relied on the implied threat of the government's border powers to force Garelick into providing incriminating, testimonial statements he never would have made by his own free choice.

Confirming that the government knew its agents had acted improperly, the government hid the fact that it had coercively obtained Garelick's passcode in subsequent warrants discussing the border search.  *Cf. United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir.), *on reh'g*, 91 F.3d 331 (2d Cir. 1996) (good faith exception unavailable to officers who fail to disclose "all potentially adverse information to the issuing judge").  In particular, as noted, the June 2022 warrant application pretends that Garelick's password was not known to law enforcement. (Shapiro Decl. Ex. 5 at SDNY_01_00819317, ¶24(f)).  But an agent executing that warrant had no compunction about taunting Garelick with the fact that the FBI *did* have his password, because he had been tricked into giving it up at the border.  (Garelick Decl. ¶ 19).

The government's conduct mandates suppression of both the password and the materials it obtained using that password, including the contents of Garelick's phone and the returns from the other warrants that relied on it.  The government repeatedly used the materials it uncovered using Garelick's password as its lead evidence that there was "probable cause" to search specific accounts and devices.  In a February 10, 2022 application, for example, an agent described the materials obtained at the border at length to justify the searching various Apple and Gmail accounts.  By contrast, much of the other evidence the agent put forward to justify searching those specific accounts was circumstantial, including a generic recitation of the agent's "experience" finding relevant information on email and iCloud accounts.  (*Compare* Shapiro Decl. Ex. 6 at SDNY_01_00819053-63, ¶17 *with id.* at SDNY_01_00819063-65, ¶18).  And

while the subsequent warrants also referenced returns from the February warrant, they continued to lead with the materials obtained at the border.  (*E.g.*, Shapiro Decl. Ex. 9 at SDNY_01_00819203-07; *see also* Ex. 7 at SDNY_01_00818905 (attaching Ex. 6), Ex. 8 at SDNY_01_00818924 (same)).  These materials are all tainted fruits of a Fifth Amendment violation, and they must be suppressed.

### D.  The Government Must Disclose Garelick's Other Statements

The government must disclose the substance of any statement Garelick made during the border stop that is relevant to this case.  *First*, Garelick has requested production of material discoverable pursuant to Federal Rule of Criminal Procedure 16.  (Shapiro Decl. Ex. 10). Pursuant to Rule 16(a)(1), the government is therefore required to disclose the substance of any "relevant oral statement made by the defendant…in response to interrogation by a person the defendant knew was a government agent if the government intends to use that statement at trial," as well as portions of written records containing the substance of such statements or any other relevant statements.  *Second*, the government is required to disclose, as *Brady* material, any statement Garelick made that may exculpate him, regardless of whether that statement "has been recorded in tangible form."  *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007).  In particular, Garelick is entitled to know about any statements that demonstrate his good faith.  *Cf. United States v. Biaggi*, 909 F.2d 662, 692 (2d Cir. 1990) ("evidence of a defendant's innocent state of mind [is] critical to a fair adjudication of criminal charges").

### E.  In The Alternative, A Hearing Is Warranted

If there is any question as to whether Garlick has made an adequate showing, he is, at a minimum, entitled to a hearing to determine whether this evidence should be suppressed.  "An evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that

contested issues of fact going to the validity of the search are in question." *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992); *see also Anderson*, 929 F.2d at 99 ("Whether a confession is a product of coercion may only be determined after careful evaluation of the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials.").

At a minimum, Garelick has raised genuine issues of material fact as to whether he was coerced into disclosing his password, given the agents' affirmative misrepresentations that the interaction was routine. A hearing is also required so that Garelick can learn the substance of any other relevant statements he made, whether they are, in the government's view, inculpatory—and therefore subject to suppression—or exculpatory—and therefore subject to *Brady*'s disclosure requirements. Accordingly, Garelick respectfully requests an evidentiary hearing on his motion.

## II.   THE GOVERNMENT SHOULD BE REQUIRED TO PROVIDE A BILL OF PARTICULARS

At a minimum, the government must provide a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f), identifying:  (1) all alleged co-conspirators and tippees; (2) the material non-public information Garelick allegedly provided; and (3) the trades at issue. A bill of particulars should be ordered where necessary to enable the "defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988). Garelick needs the information requested—which cannot be reasonably gleaned either from the Indictment or the discovery produced by the government—to prepare his defense and have fair notice of the charges against him.

### A.   The Government Should Be Required To Identify The Alleged Co-Conspirators And Tippees

The Indictment repeatedly alleges that Defendants schemed with a broad array of unidentified parties to carry out the charged offenses.  It alleges that they tipped "their friends and/or employees" (Dkt. 1 ¶ 3, 13), and conspired with "others known and unknown" to commit securities fraud, including by "caus[ing] others to trade in DWAC securities" (*id.* ¶¶15-18).  And although the government has disclosed the identity of certain specific individuals and entities referenced in the Indictment (Ex. 11 at 4), it did not disclose whether it intends to prove that Defendants conspired with or tipped any *other* people, or who they might be.

The government should be ordered to identify any such individuals.  A request for a bill of particulars identifying all alleged co-conspirators is "fairly common" and "generally granted by the district courts" in this Circuit.  *United States v. Failla*, 1993 WL 547419, at *7 (E.D.N.Y. Dec. 21, 1993) (collecting cases; ordering the government to identify "the persons referred to by the expression 'others'" in the indictment and to indicate whether each person was alleged to be a co-conspirator or aider-and-abettor).  If the government intends to hold Garelick criminally responsible for the conduct and trades of other people, Garelick is entitled to know who they are.  Such information is necessary "to allow [Garelick] to properly prepare for trial" and to "inform [him] of the accusations against him."  *United States v. Allocco*, 801 F. Supp. 1000, 1003 (E.D.N.Y. 1992), *aff'd*, 29 F.3d 620 (2d Cir. 1994) (ordering identification of "the 'others referred to in the indictment"); *United States v. Kahale*, 789 F. Supp. 2d 359, 372-74 (E.D.N.Y. 2009), *aff'd sub nom. United States v. Graham*, 477 F. App'x 818 (2d Cir. 2012) (same).

That is especially so here, where the DWAC / Trump Media transaction involved numerous participants, several of whom have been publicly accused of misconduct wholly unrelated to Garelick or his co-defendants.  An October 2021 *New York Times* article reported that, by the summer of 2021, "people affiliated with Trump Media were signaling in

18

conversations with Wall Street financiers that they were nearing a deal to merge with a SPAC, according to people with knowledge of those conversations," even though those disclosures appeared to contravene SEC rules.[5]  An SEC whistleblower complaint also alleged that DWAC CEO Patrick Orlando engaged in federal securities fraud violations,[6] and another DWAC board member filed a civil suit against Orlando, alleging that he engaged in fraud.  (*See Shevland v. Orlando*, No. 1:21-cv-24324 (S.D. Fl.)).  In a similar vein, discovery the government produced suggests that it believes several other individuals may have engaged in securities fraud.  In its warrant applications in this case, the government asserted there was probable cause to believe that Orlando, along with several other individuals who have not been charged, either "committed the Subject Offenses" and/or had evidence pertaining to such offenses.  (*E.g.*, Shapiro Decl. Ex. 6 at SDNY_01_00819038 & n.1.).  Without a bill of particulars, Garelick has no way of knowing whether he should undertake the considerable burden of preparing a defense concerning each of these individuals and their alleged misdeeds.

Finally, disclosure is appropriate because "there is no legitimate concern that disclosing the names of unindicted co-conspirators will endanger those individuals or compromise the Government's investigation."  *United States v. Nachamie*, 91 F. Supp. 2d 565, 573 (S.D.N.Y. 2000).  This is a white-collar insider trading case and Garelick has no criminal history whatsoever, so there is no basis to assume a disclosure to him poses any threat.  He is entitled to know the names of any alleged co-conspirators or tippees.

---

[5] *The New York Times*, "Trump's $300 Million SPAC deal may have skirted securities laws" (Oct. 29, 2021), *available at* https://www.nytimes.com/2021/10/29/business/trump-spac-digital-world.html
[6] *The Washington Post*, "Co-founder of Trump's media company details Truth Social's bitter infighting" (Oct. 15, 2022), *available at* https://www.washingtonpost.com/technology/2022/10/15/truth-social-trump-animosity-whistleblower/

**B.  The Government Should Be Required To Identify The Material Non-Public Information Garelick Allegedly Shared**

Several counts of the Indictment are premised on the allegation that Garelick improperly passed material non-public information to others so that they could trade in DWAC securities. (*E.g.*, Counts 1, 3, 4, 6, 7).  But the Indictment also alleges Patrick Orlando—and not Garelick— "repeatedly stated that Trump Media had become a likely target for DWAC" on calls with all three Defendants before the IPO, and even before Garelick joined the board.  (¶8).  Whether that disclosure constitutes "material non-public information" or not, it appears to be the core information on which the government alleges each Defendant improperly traded.  (*E.g.*, ¶11 (alleging that Defendants "used material non-public information about the fact that Trump Media was a likely acquisition target for DWAC to make well-timed purchases of DWAC securities")).

The remaining questions, then, are what additional material non-public information the government contends *Garelick* provided, to whom, and when.  As Judge Holwell recognized in *United States v. Rajaratnam*, those questions go to the heart of what the government must prove in an insider trading case, and they are heavily fact- and context-specific.  2010 WL 2788168, at *2 (S.D.N.Y. July 13, 2010).  Considered from the standpoint of an alleged tippee, "A defendant might argue that the information he sought to obtain was not material, or that it was already public at the time he tried to get it.  But he can only do that if he knows what the information *is* and when it was conveyed."  *Id.*  By the same token, Garelick, an alleged tipper, needs to know what information he is accused of providing, so he can evaluate whether that information was material, and whether it was already in circulation via other sources.

In *Rajaratnam*, Judge Holwell ordered the government to identify the "substance" and "date" on which allegedly material non-public information was exchanged.  *Id.* at *5; *see also United States v. Nacchio*, 2006 WL 2475282, at *8 (D. Colo. Aug. 25, 2006) (directing

government to identify more specifically the material, non-public information obtained by alleged inside trader).  Garelick is entitled to the same specificity.

### C. The Government Should Be Required To Identify The Trades At Issue

Relatedly, the Indictment fails to specify the full universe of trades the government plans to prove were illegal.  Although the Indictment alleges specific trades in the substantive securities fraud counts (Counts 2-9), other allegations nullify that specificity.  For instance, Count 1 alleges broadly that, in furtherance of the alleged insider trading conspiracy, Defendants "caused others to trade in DWAC securities that were listed on the Nasdaq exchange," without disclosing who carried out those alleged trades or when they occurred.  (Dkt. 1, ¶18).  More confusing still, the factual background of Count One discusses at least one trade that is *not* included in the substantive securities fraud counts.  Namely, it alleges that an individual identified in the Indictment as Shvartsman's "business associate" purchased 100,000 DWAC warrants on October 20, 2021, shortly before the TMG / DWAC merger was announced.  (*Id.* ¶ 13(c)).  But although Count 6 concerns the same individual's allegedly improper transactions between September 13 and October 20, it does not include the 100,000-warrant purchase.  The government's warrant applications discuss additional trades that are not mentioned in the Indictment.  (*E.g.*, Shapiro Decl. Ex. 6 at SDNY_01_00819051-52).

Garelick accordingly asked the government to identify the relevant trades.  The government declined to do so, beyond confirming that "the trades alleged to be unlawful are the open market purchases that occurred after the IPO."  (Shapiro Decl. Ex. 12).  Although that temporal restriction is helpful, and Garelick plans to rely on it, it does not suffice.  It is especially confusing and prejudicial for the government to discuss trades in the Indictment and key warrant applications without saying whether the government plans to try to tag Garelick with criminal liability for those trades at trial.  In analogous circumstances, the Second Circuit vacated a

21

conviction for an offense that could have been—but was not—charged in an indictment, holding such conduct failed to provide a defendant with adequate notice.  *United States v. Wozniak*, 126 F.3d 105, 111 (2d Cir. 1997); *see also United States v. D'Amelio*, 683 F.3d 412, 423 (2d Cir. 2012) (affirming conviction where "well in advance of trial, the government provided the defendant with notice of the communications on which it would rely").

### D. The Government's Voluminous Production Does Not Provide Fair Notice

In response to Garelick's request for a bill of particulars, the government implied that any vagaries in the indictment could be cured through the voluminous discovery it has produced. (Shapiro Decl. Ex. 11 at 3-4).  That is wrong.  The government cannot fulfill its obligations "by providing mountains of documents to defense counsel who [are] left unguided" in determining what the government would prove at trial.  *United States v. Bortnovsky*, 820 F.2d 572, 574-75 (2d Cir. 1987).  In fact, "the large volume of material disclosed is precisely what necessitates a bill of particulars," *United States v. Bin Laden*, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000), because "a bill of particulars [will] bring focus to the massive amounts of discovery produced," *United States v. Luna*, 2006 WL 1668006, at *3 (D. Conn. May 17, 2006).  *See also Rajaratnam*, 2010 WL 2788168, at *2 (collecting cases holding same).

The government's sprawling production includes hundreds of thousands of pages of documents, and its production cover letters reveal that materials were obtained from at least twenty individuals, as well as email and phone companies, financial institutions, and other entities.  But the mere fact that the government obtained records from or about a given individual does not elucidate who the alleged tippees and co-conspirators are.  Nor does this production shed light on which trades are at issue, or what information Garelick allegedly disclosed.

As a matter of fundamental fairness, the Court should require the government to identify the requested particulars.

## III.    THE COURT SHOULD ORDER THE DEFENDANTS' PROPOSED SCHEDULE

The parties have been unable to reach agreement on a proposed pre-trial disclosure schedule.  On behalf of all Defendants, Garelick respectfully submits that the following schedule is appropriate and gives all parties adequate time and notice to prepare for trial:

- February 15, 2024:  Government deadline to disclose exhibits, expert disclosures, Rule 404(b) materials, alleged co-conspirator statements, and any materials the government would use under Rule 608(b) or Rule 806 pertaining to any Defendant;

- March 15, 2024:  Government deadline to produce §3500 material and a witness list; Defense deadline for expert disclosures;

- April 8, 2024:  Defense deadline to produce case-in-chief exhibits;

- Following opening statements:  Defense deadline to produce §3500 material and a witness list.

*      *      *

In addition, Garelick joins the motions filed by Michael Shvartsman, to the extent applicable to him.

<u>CONCLUSION</u>

For the foregoing reasons, Garelick requests that this Court suppress Garelick's improperly obtained statements and the fruits thereof, order the government to provide a bill of particulars, and award any other appropriate relief that justice so requires.


Dated:   December 22, 2023
New York, New York                              Respectfully submitted,

 /s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Jonathan P. Bach
Alice Buttrick
Shapiro Arato Bach LLP
1140 Avenue of the Americas, 17th Floor
New York, New York 10036

23

(212) 257-4880
ashapiro@shapiroarato.com
jbach@shapiroarato.com
abuttrick@shapiroarato.com

*Attorneys for Defendant Bruce Garelick*

24