**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,     :
    :
v.     :
    :     Case No. 23-CR-307 (LJL)
MICHAEL SHVARTSMAN,     :
GERALD SHVARTSMAN, and     :
BRUCE GARELICK,     :
    :
    :
    :
         Defendants.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT MICHAEL SHVARTSMAN'S OMNIBUS PRE-TRIAL MOTIONS

**TAI PARK PLLC**
1140 Ave of the Americas, 17th Floor
New York, NY 10036
Tel: (917) 346-3914
tai@taiparklaw.com

*Counsel for Defendant, Michael Shvartsman*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

FACTUAL BACKGROUND .............................................................................................. 4

ARGUMENT ...................................................................................................................... 5

    I.  THE INDICTMENT SHOULD BE DISMISSED PURSUANT TO
       ARTICLE I AND/OR THE DUE PROCESS CLAUSE OF THE
       CONSTITUTION .................................................................................................. 5

        A.  Criminalization of Insider Trading Violates Article I of the
             Constitution ................................................................................................. 6

        B.  Securities Statutes As Applied to Insider Trading Are Void
             For Vagueness ............................................................................................ 12

    II.  THE COURT SHOULD SUPPRESS THE FRUITS OF ANY
       VIOLATION OF SIXTH AMENDMENT AND HOLD A HEARING
       TO DETERMINE THE FULL EXTENT OF THE MISCONDUCT
       INVOLVED IN PRE- AND POST-INDICTMENT CONTACT WITH
       REPRESENTED DEFENDANT ........................................................................... 19

        A.  Summary of the Relevant Facts ................................................................. 19

        B.  Sixth Amendment Violation ...................................................................... 22

        C.  Violation of Ethical "No Contact" Rules ................................................... 23

    III.  THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE
        GOVERNMENT MISLED THE GRAND JURY AS TO A
        SIGNIFICANT FACT; ALTERNATIVELY, THE GRAND JURY
        MATERIALS SHOULD BE DISCLOSED TO THE DEFENSE ....................... 27

        A.  Legal Standard .......................................................................................... 27

        B.  The Indictment Should be Dismissed ....................................................... 29

        C.  In The Alternative Defendant Should be Provided Access to Grand
             Jury Materials ........................................................................................... 30

i

IV.  THE COURT SHOULD ORDER THE GOVERNMENT TO
PROVIDE A BILL OF PARTICULARS ....................................................31

A.  Legal Standard .................................................................................31

B.  A Bill of Particulars Must Identify Details of The Alleged MNPI ...................33

C.  A Bill of Particulars Must Identify Any Unindicted Co-Conspirators
and Tippees ......................................................................................35


CONCLUSION .................................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

<u>Federal Cases</u>

*Bank of Nova Scotia v. U.S.*,
    487 U.S 250. ........................................................................................................ 28

*Carpenter v. United States*,
    138 S. Ct. 2206 (2017) ........................................................................................ 29

*Chiarella v. United States,*
    445 U.S. 222 (1980) .............................................................................................. 7

*Ciminelli v. United States,*
    598 U.S. 306 (2023) ............................................................................................ 14

*Connolly v. Gen. Const. Co.*,
    269 U.S. 385 (1926) ............................................................................................ 18

*Douglas Oil Co. of Cal. v. Petrol Stops Nw.*,
    441 U.S. 211 (1979) ............................................................................................ 29

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ...................................................................................... 13, 18

*Gundy v. United States,*
    139 S.Ct. 2116, 588 U.S. ___ (2019) .............................................. 6, 7, 9, 11, 12

*Illinois v. Perkins,*
    496 U.S. 292, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990) ................................ 23

*Johnson v. United States,*
    135 S. Ct. 2551 (2015) ........................................................................................ 13

*Kelly v. United States,*
    140 S. Ct. 1565 (2020) .................................................................................. 14, 17

*Maine v. Moulton,*
    474 U.S. 159 (1985) ............................................................................................ 22

*McDonnell v. United States,*
    136 S. Ct. 2355 (2016) ........................................................................................ 13

*McNabb v. United States,*
    318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) ........................................ 24

*Michigan v. Harvey,*
    494 U.S. 344, 110 S. Ct. 1176, 108 L. Ed. 2d 293 (1990) ........................... 23

*Olan v. United States,*
    141 S.Ct. 1040 (2021) ..................................................................................... 17

*Russell v. United States,*
    369 U.S. 749 (1962) ........................................................................................ 32

*Salman v. United States,*
    540 U.S. 420 (2016) ........................................................................................ 14

*Salman v. United States,*
    580 U.S. 39, 137 S.Ct. 420 (2016) .................................................................... 7

*Salman v. United States,*
    850 U.S. 420 (2016) ........................................................................................ 16

*Sessions v. Dimaya,*
    138 S. Ct. 1204 (2018) .................................................................................... 14

*Skilling v. United States,*
    561 U.S. 358 (2010) ........................................................................................ 13

*United States. v. Whitman,*
    904 F. Supp. 2d  (S.D.N.Y. 2012) ............................................................... 9, 10

*United States v. Bari,*
    750 F.2d 1169 (2d Cir. 1984) ......................................................................... 27

*United States v. Barnaby,*
    No. 18-CR-33 (S-2) (NGG), 2021 WL 2895648 (E.D.N.Y. July 8, 2021) ............ 23

*United States v. Barnes,*
    158 F.3d 662 (2d Cir. 1998) ........................................................................... 32

*United States v. Blaszczak,*
    56 F.4th 230 (2d Cir. 2022) ............................................................................ 17

*United States v. Blaszczak,*
    947 F.3d 19 (2d Cir. 2019) ........................................................................ 16, 17

*United States v. Bortnovsky,*
820 F.2d 572 (2d Cir. 1987)...................................................................... 32

*United States v. Bravo-Fernandez,*
239 F. Supp. 3d 411 (D.P.R. 2017).......................................................... 28

*United States v. Brito,*
907 F.2d 392 (2d Cir.1990)................................................................. 27, 28

*United States v. Carter,*
2005 WL 180914 ......................................................................................... 28

*United States v. Cerullo,*
2007 WL 2462111 (S.D.Ca. Aug. 28, 2007) ........................................... 28

*United States v. Chestman,*
947 F.2d 551 (2d Cir. 1991)*, cert denied,* 503 U.S. 1004 (1992) ............ 8

*United States v. Ciambrone,*
601 F.2d 616 (2d Cir. 1979)...................................................................... 28

*United States v. Contorinis,*
09 Cr. 1083 (RJS), Order, Dkt No. 49 (S.D.N.Y. May 5, 2010) ............ 33

*United States v. Cuervelo,*
949 F.2d 559 (2d Cir. 1991)...................................................................... 25

*United States v. D'Amico,*
734 F. Supp. 2d 321 (S.D.N.Y. 2010)....................................................... 32

*United States v. Davidoff,*
845 F.2d 1151 (2d Cir. 1988).................................................................... 35

*United States v. DeVillio,*
983 F.2d 1185 (2d Cir. 1993).................................................................... 24

*United States v. Falbo,*
No. 92 CR. 0763 (PNL), 1993 WL 147441 (S.D.N.Y. Apr. 6, 1993) ...... 34

*United States v. Fernandez,*
No. 00 CR. 420 (SWK), 2000 WL 1409738 (S.D.N.Y. Sept. 22, 2000)......... 28

*United States v. Feurtado,*
191 F.3d 420 (4th Cir. 1999) .................................................................... 28

*United States v. Hammad*,
   858 F.2d 834 (2d Cir. 1988)......................................................................... 24, 25

*United States v. Hogan*,
   712 F.2d 757 (2d Cir. 1983)............................................................................... 27

*United States v. Hudson*,
   11 U.S. 32 (1812).................................................................................................. 6

*United States v. James*,
   415 F. Supp. 2d 132 (E.D.N.Y. 2006) ............................................................... 23

*United States v. Jamil*,
   707 F.2d 638 (2d Cir.1983).................................................................................. 24

*United States v. Koerber*,
   966 F. Supp. 2d 1207 (D. Utah 2013)................................................................. 25

*United States v. Lanier*,
   520 U.S. 259 (1997).............................................................................................. 6

*United States v. Martoma*,
   869 F.3d 55 (2d Cir. 2017).................................................................................. 15

*United States v. Martoma*,
   894 F.3d 64 (2d Cir. 2017)............................................................................ 15, 16

*United States v. Nacchio*,
   No. 05 CR 00545 EWN, 2006 WL 2475282 (D. Colo. Aug. 25, 2006)............ 32, 34

*United States v. Newman,*
   773 F.3d 438 (2d Cir. 2014)....................................................................... passim

*United States v. Nouri*,
   611 F. Supp. 2d 380 (S.D.N.Y 2009)................................................................. 25

*United States v. Pinto-Thomaz*,
   352 F. Supp. 3d 287 (S.D.N.Y 2018)................................................................. 35

*United States v. Pirro*,
   212 F.3d 86 (2d Cir. 2000).................................................................................. 32

*United States v. Rajaratnam*,
   No. 09 CR. 1184 (RJH), 2010 WL 2788168 (S.D.N.Y. July 13, 2010) ....... 32, 33, 34

*United States v. Restrepo*,
547 Fed. Appx. 34 (2d Cir. 2013) ............................................................... 28

*United States v. Rommy*,
506 F.3d 108 (2d Cir. 2007) ....................................................................... 22

*United States v. Santoro*,
647 F. Supp. 153 (E.D.N.Y. 1986) ........................................................ 33, 34

*United States v. Stein*,
541 F.3d 130 (2d Cir. 2008) ....................................................................... 22

*United States v. Torres*,
910 F.2d 205 (2d Cir. 1990) ....................................................................... 32

*United States v. Ulbricht*,
858 F.3d 71 (2d Cir. 2017) ......................................................................... 29

*United States v. Williams*,
504 U.S. 36 (1992) ...................................................................................... 27

*United States v. Yousef*,
327 F.3d 56 (2d Cir. 2003) ......................................................................... 23

*Wayman v. Southard*,
23 U.S. (10 Wheat.) 1, 6 L.Ed. 253 (1825) .................................................. 6

*Whalen v. United States*,
445 U.S. 684 (1980) ...................................................................................... 6

*Will v. United States*,
389 U.S. 90 (1967) ...................................................................................... 32

## United States Constitution

Article I of the Constitution ........................................................... 1, 5, 6, 11

U.S. Const. amend. VI ................................................................................ 31

## Federal Statutes

15 U.S.C. Section 78j(b) ......................................................................... 4, 12

18 U.S.C. Section 1348 ................................................................. 1, 4, 13, 17

28 U.S.C. § 530B ..................................................................... 24, 25


## Federal Rules

Fed. R. Crim. P. 6(e)(3)(E)(ii) .................................................. 29

Rule 7 of the Federal Rules of Criminal Procedure ..................... 31, 34

Rule 7(f) ................................................................................. 32


## State Rules

New York Rule 4.2 ................................................................... 24


## Federal Regulations

17 C.F.R. § 240.10b-5 ............................................................. 13

28 C.F.R. §77.3 ...................................................................... 24

28 C.F.R. § 77.4(f) .................................................................. 25


## Other Authorities

166 Cong. Rec. H9272 ............................................................. 10

167 Cong. Rec. H2461 ............................................................. 9

167 Cong. Rec. H2461-2 .......................................................... 18

167 Cong. Rec. H2462 ............................................................. 2, 10

H.R. 559 ................................................................................ 10

H.R. 1625 .............................................................................. 10

H.R. 2534 .............................................................................. 10

HR 2655 ................................................................................ 2, 9

*Congress: U.S. Needs an Insider Trading Law*, N.Y.L.J. (Oct. 23, 2015),
    www.law.com/newyorklawjournal/almID/1202740459962/ ............................................... 8, 16

*Fraud, Fiduciaries, and Insider Trading*,
    10 Hofstra L. Rev. 341 (1982) ...................................................................................... 15

*Insider Trading and the Ambiguous Quest for Edge*,
    116 Mich. L. Rev. 945 (2018)....................................................................................... 15

*Investment Analysts and the Law of Insider Trading*,
    76 Va. L. Rev. 1023 (1990) ............................................................................................ 9

*Misappropriation: A General Theory of Liability for Trading on Nonpublic Information*,
    13 Hofstra L. Rev. 101 (1984) ....................................................................................... 15

*Newman/Martoma: the Insider Trading Law's Impasse and the Promise of Congressional
    Action*, 25 Fordham J. of Corp. & Fin. Law 1, 13-30 (2019) .............................................. 9, 16

*Reinventing Insider Trading: The Supreme Court Misappropriates the Misappropriation Theory*,
    32 Wake Forest L. Rev. 1157 (1997)............................................................................. 10, 11

*SEC v. Capital Gains Research Bureau and the Investment Advisers Act of 1940*,
    91 B.U. L. Rev. 1051 (2011) ......................................................................................... 15

*Watching Insider Trading Law Wobble: Obus, Newman, Salman, Two Martomas and Blaszczak*,
    89 Fordham L. Rev. 507 (2020).............................................................................. 8, 14, 15, 17

Brief of N.Y.C. Council of Def. Law. and Nat'l Ass'n of Crim. Def. Law. as Amici Curiae in
    Support of Defendant- Appellant's Petition for Rehearing *En Banc* at 6, *United States v.
    Martoma,* 894 F.3d 64 (2d Cir. 2017) (No. 14-3599),
    2018 WL 4075999 ........................................................................................................ 16

Petition of the United States of America for Rehearing and Rehearing En Banc, *United States v.
    Newman*, 773 F.3d 438 (2d Cir. 2015) (No. 13-1837), 2015 WL 1064423, at *2 (No. 13-1837),
    2015 WL 1064423 ....................................................................................................... 16

Petition for a Writ of Certiorari, *United States v. Newman*, No. 15-137 (U.S. July 30, 2015)
    2015 WL 4572753 ....................................................................................................... 16

Defendant Michael Shvartsman ("Defendant" or "Mr. Shvartsman") respectfully submits this memorandum of law in support of his Omnibus Pretrial Motions. Specifically, Mr. Shvartsman moves: (1) to dismiss the Indictment pursuant to Article I and the Due Process Clause of the Constitution; (2) for suppression of the fruits of any information obtained by a government informant from Mr. Shvartsman and his in-house counsel after charges in this case were filed, pursuant to the Sixth Amendment, and for an evidentiary hearing with respect to similar activities by the informant pre-indictment; (3) to dismiss the Indictment, which is in part premised on false evidence presented to the Grand Jury or, in the alternative, for inspection of the Grand Jury presentation, and (4) for a bill of particulars.

The Indictment charges Mr. Shvartsman with trading in the securities of a special purpose acquisition company ("SPAC") called DWAC, in which he was an investor. It alleges that Mr. Shvartsman became aware of material nonpublic information about DWAC's potential merger with a private company, Trump Media Group ("TMG"), and traded on the basis of such information, reaping a profit. This conduct is alleged to have violated the insider trading prohibition, in violation of Section 10(b) of the Exchange Act, its enabling Rule 10b-5, as well as 18 U.S.C. Section 1348.

The bases for Mr. Shvartsman's motions are, in summary, as follows. First, the insider trading charges are premised on a judge-made criminal prohibition, not legislation, as Article I of the Constitution and the separation of powers doctrine require. While the prohibition has been characterized as judicial interpretation of the anti-fraud provisions of existing securities statutes, its elements simply cannot be discerned from any words in such statutes. Recent, deep confusion in the Second Circuit, as well as three, failed congressional efforts to pass legislation, demonstrate

that clear rules of insider trading cannot be drawn from existing statutory language. And, even if a highly elaborate interpretation of that language could theoretically support some conception of a crime, such law would founder against the Due Process Clause and its void for vagueness doctrine. The Due Process Clause requires that criminal statutes clearly delineate for the common layperson what is forbidden. The securities statutes do not provide such notice of the insider trading prohibition.

One congressman summed up the Article I and Due Process concerns in just one plea to his colleagues in the House: "We make the laws. If we are going to send people to jail, if we are going to stop the confusion of judge-made law, let's do our job and pass this legislation." 167 Cong. Rec. H2462 (daily ed. May 18, 2021) (statement of Rep. Jim Himes urging passage of the Insider Trading Prohibition Act, HR 2655, 117th Cong. (2021).) No legislation passed.

Second, discovery produced recently by the government demonstrates rampant violations of the "no-contact" rule (Rule 4.2(a) of the Rules of Professional Conduct) and Mr. Shvartsman's Sixth Amendment rights. At a time when the government had been told by defense counsel that they were representing him during the course of the pre-indictment investigation, the government sent in an informant who posed as a trustee to Mr. Shvartsman and his trusts. Over the course of months, this supposed fiduciary gained access to the Defendant and his in-house counsel and sought information pertaining to the investigation. Then, even <u>after</u> Mr. Shvartsman was charged in this case, the informant persisted in his contacts, calls and meetings with Mr. Shvartsman and his counsel. The full scope of the government's conduct and the uses to which it made the gathered intelligence cannot be determined without an evidentiary hearing. The government has informed the defense that it now plans to supersede the Indictment to add money laundering charges against Mr. Shvartsman. Based on the Sixth Amendment violation, the Court should suppress the fruits

of any improper, post-indictment contacts. But it should also hold an evidentiary hearing to determine the facts and circumstances of all contacts, reach conclusions about the full scope of the violation of the no contact rule, and fashion an appropriate remedy.

Third, the government made a presentation to the Grand Jury that they have since conceded included misleading information. This misinformation led to a critical passage in the Indictment suggesting that co-defendant Bruce Garelick tipped Mr. Shvartsman as to material nonpublic information about the potential merger with TMG. The claim was based on a text message from Mr. Garelick to Mr. Shvartsman. But even the most cursory review of that brief, three-line text demonstrates that it had nothing to do with DWAC or TMG. The two men were communicating about a completely different business opportunity. The government chose to present only part of one line in the text. That the false portrayal of this text materially infected the Grand Jury process is evident from the fact that the text is one of the very few specific communications directly (and only partially) quoted in the Indictment. The Indictment should thus be dismissed, or, in the alternative, the relevant portions of the government's presentation to the Grand Jury should be made available for inspection by the defense and/or the Court *in camera*.

Finally, neither the Indictment nor the produced discovery provides information the Defendant is entitled to in order to prepare adequately for trial. To prove the crime of insider trading, the government must at a minimum prove someone improperly shared material nonpublic information ("MNPI"), yet the government has yet to identify the specific communications it intends to produce at trial. As discussed above, they presented a part of one text, but they have since admitted the text is not proof of anything. What, then, was the MNPI, who shared it, when, and with whom? Without knowing each specific communication the government contends was MNPI, Mr. Shvartsman cannot be expected to defend against the charges. The Indictment also

references "others," including other tippees of information, but does not identify them. Mr. Shvartsman cannot be expected to defend against a conspiracy charge without knowing who the government contends were his co-conspirators or tippees. Accordingly, the Court should require the government to provide the requested bill of particulars.

## FACTUAL BACKGROUND

On June 26, 2023, the government filed a sealed, 10-count Indictment against Michael Shvartsman, Gerald Shvartsman, and Bruce Garelick. (Ind. (Dkt. No. 1) ¶ 1). It was unsealed three days later, on June 29, 2023. On that same day, Michael Shvartsman was arrested in Miami, Florida, where he resides. *See* the Declaration of Tai H. Park, dated December 22, 2023, at ¶ 13 (hereinafter the "Park Dec.").

The Indictment alleges that the defendants engaged in an insider trading scheme in connection with a prospective merger between Digital World Acquisition Corporation ("DWAC"), a special purpose acquisition company[1] and Trump Media and Technology Group ("TMG"), a media company founded by ex-President Donald J. Trump. *See generally* Indictment. The defendants are alleged to have traded on the basis of material nonpublic information that DWAC would likely merge with TMG, and that they reaped trading profits when the information was publicly announced. The Indictment alleges that this conduct violated Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. Section 78j(b)), its enabling Rule 10b-5 (17 C.F.R. Section 240.l0b-5), and/or 18 U.S.C. Section 1348 (Ind. at 12-13). Defendants are also accused of conspiring to engage in, or aiding and abetting, such securities law violations.

Defendants, along with a separate corporate Defendant, Rocket One Capital, LLC ("Rocket One"), have also been sued in a parallel civil case by the Securities and Exchange Commission,

---

[1] A special purpose acquisition company ("SPAC") is a publicly traded blank-check company whose purpose is to merge with a private company so that the private company may become publicly traded. (Ind. ¶ 5).

*SEC v. Shvartsman, et al.*, Case No. 23-CV-5567 (S.D.N.Y. 2023).  Mr. Shvartsman is a principal

of Rocket One, and a separate individual, Michael Park, is general counsel for Rocket One and is

also legal counsel to Mr. Shvartsman. (Park Dec. at ¶ 9).

A summary of the facts relating to the government's efforts to investigate alleged money

laundering activities through the use of an informant are set forth *infra* at Point II(A), in the section

discussing the motion to suppress.  As that section explains, the government's informant insinuated

himself into meetings and discussions with Mr. Shvartsman and his in-house counsel, both before

and after the indictment.  He did so by posing as a person who could provide trustee services and

he was in fact engaged by Mr. Shvartsman as a trustee.  The goal of his covert efforts was to

investigate Mr. Shvartsman for money laundering.

On December 12, 2023, the government informed Mr. Shvartsman's counsel that it

intended to supersede the Indictment to add money laundering charges against Mr. Shvartsman in

connection with his financial transactions involving his DWAC trading proceeds. They stated the

charges would be filed sometime early in the new year, 2024.  (Park Dec. at ¶ 17).

Defendant Shvartsman now moves the Court for the various forms of relief set forth in his

Notice of Motion, as further explained below.[2]

**ARGUMENT**

**I.    THE INDICTMENT SHOULD BE DISMISSED PURSUANT TO ARTICLE I
AND/OR THE DUE PROCESS CLAUSE OF THE CONSTITUTION**

Under our democratic system of government and Article I of the Constitution, only

Congress has the power to define criminal laws.  What is commonly called the insider trading

prohibition is a judge-made rule purporting to interpret anti-fraud language in securities statutes.

---

[2] To avoid duplication, all other facts pertinent to the various motions will be set forth in their respective
sections *infra*.

But the intricate elements of insider trading cannot be discerned from any words in those statutes. As a criminal law made by judges, this prosecution violates Article I of the Constitution and should be dismissed. Even if this Court were to indulge the fiction that insider trading prohibitions were a legitimate product of judicial "interpretation" of existing statutes, rather than law-making, the Indictment should be dismissed because the securities laws are void for vagueness as applied to insider trading. No ordinary person could be expected to read the statutory language as prohibiting trades based on material nonpublic information in violation of fiduciary duty.

### A. Criminalization of Insider Trading Violates Article I of the Constitution

"Article I of the Constitution provides that '[a]ll legislative Powers herein granted shall be vested in a Congress of the United States.' § 1. Accompanying that assignment of power to Congress is a bar on its further delegation. Congress, this Court explained early on, may not transfer to another branch 'powers which are strictly and exclusively legislative.' *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43, 6 L.Ed. 253 (1825)." *Gundy v. United States*, 139 S.Ct. 2116, 2123-4, 588 U.S. ___ (2019).

This principle has especial force where criminal laws are in question. The Supreme Court has long enforced the rule that Congress, not the courts, has exclusive power to define federal crimes. *United States v. Hudson*, 11 U.S. 32, 34 (1812). *See also*, *United States v. Lanier*, 520 U.S. 259, 267 (1997) (Federal crimes are defined by Congress, not the courts . . . ."); *Whalen v. United States*, 445 U.S. 684, 689 (1980)("[W]ithin our federal constitutional framework …, the power to define criminal offenses and to prescribe the punishments to be imposed upon those found guilty of them, resides wholly with the Congress.")

In a dissenting opinion (joined by Chief Justice Roberts and Justice Thomas), Justice Gorsuch explained why this rule was so important to our constitutional structure.

> [The framers] believed the new federal government's most dangerous power was the power to enact laws restricting the people's liberty. An "excess of law-making" was, in their words, one of "the diseases to which our governments are most liable." [quoting from The Federalist No. 62, at 378 (C. Rossiter ed. 1961)] To address that tendency, the framers went to great lengths to make lawmaking difficult. In Article I, . . . the framers insisted that any proposed law must win the approval of two Houses of Congress—elected at different times, by different constituencies, and for different terms in office—and either secure the President's approval or obtain enough support to override his veto. … [Moreover] Article I's detailed processes for new laws were also designed to promote deliberation. "The oftener the measure is brought under examination," Hamilton explained, "the greater the diversity in the situations of those who are to examine it," and "the less must be the danger of those errors which flow from want of due deliberation, or of those missteps which proceed from the contagion of some common passion or interest." [Quoting from The Federalist No. 73, at 443].

*Gundy*, (Gorsuch, J.) 139 S. Ct. at 2134. And, as also pertinent here: "Restricting the task of legislating to one branch characterized by difficult and deliberative processes was also designed to promote fair notice and the rule of law, ensuring the people would be subject to a relatively stable and predictable set of rules." *Id*.

Insider trading law departs radically from this constitutional plan. No statute defines and prohibits insider trading. While the current prohibition has long been justified as judicial interpretation of the anti-fraud provision of the securities laws, the gap between the words "scheme to defraud" (or "deceptive device") and the prohibition on insider trading is vast. Indeed, the first Supreme Court decision to address the issue began by noting that "neither the legislative history nor the statute itself [Section 10(b) of the Exchange Act] affords specific guidance for the resolution of this case." *Chiarella v. United States*, 445 U.S. 222, 226 (1980); *see also United States v. Newman*, 773 F.3d 438, 445 (2d Cir. 2014) ("neither [section 10(b)] nor the regulations issued pursuant to it, including Rule 10b-5, expressly prohibit insider trading."), *abrogated on other grounds, Salman v. United States*, 137 S.Ct. 420, 580 U.S. 39 (2016).

A leading authority on insider trading, Professor Donald Langevoort, recently summarized the origins of this judge-made law:

> Even though open-market insider trading is hard to see as deceptive (the insider trader communicates nothing false or misleading simply by submitting an anonymous bona fide order to buy or sell), the word "fraud" was taken to be sufficiently elastic to encompass it. Duties seemingly reach as far as need be to inspire investor faith in market integrity. Or so it was thought.
>
> That generous approach to securities law was trashed by the Burger Court starting in the mid-1970s. The surprise, perhaps, is that insider trading regulation under Rule 10b-5 somehow survived this retrenchment at all. In *Chiarella,* the Supreme Court scolded the Second Circuit for its failure to restrain the overbreadth of "abstain or disclose" but then plastered together its own doctrinal edifice under the revisionist banner of fiduciary responsibility.

Donald C. Langevoort, *Watching Insider Trading Law Wobble:* Obus, Newman, Salman, *Two Martomas and Blaszczak,* 89 Fordham L. Rev. 507, 510-511 (2020) (citations omitted).

The prohibition on insider trading is thus broadly acknowledged to be a product of common law made by judges. *See* Paul A. Engelmayer, *Congress: U.S. Needs an Insider Trading Law*, N.Y.L.J. (Oct. 23, 2015), *www.law.com/newyorklawjournal/almID/1202740459962/* ("the development of U.S. insider trading law has been left to the federal courts. The U.S. Supreme Court and the Second Circuit have developed this body of law, *ad hoc,* case by case, essentially from scratch, effectively as a matter of federal common law.") *See also United States v. Chestman,* 947 F.2d 551, 572 (2d Cir. 1991) (Winter J. concurring in part, dissenting in part) (insider trading prohibition is "based solely on administrative and judicial caselaw. This caselaw establishes that some trading on material nonpublic information is illegal and some is not. The line between the two is less than clear."), *cert. denied,* 503 U.S. 1004 (1992).

The legality line is "less than clear" because judges and courts have debated competing policy interests in the capital markets, with parity of information on the one side, and on the other, the need for market efficiency driven by traders vying for informational advantage. For a detailed

discussion of this complex subject, *see* Donald C. Langevoort, *Investment Analysts and the Law of Insider Trading*, 76 Va. L. Rev. 1023, 1044-50 (1990). *See also* Tai H. Park, *Newman/Martoma: the Insider Trading Law's Impasse and the Promise of Congressional Action*, 25 Fordham J. of Corp. & Fin. Law 1, 13-30 (2019) (the policy debate began between Justices Powell and Blackmun in *Chiarella* and *Dirks* and remains the root of unresolved conflict within Second Circuit). Few laws require more careful legislative deliberation than rules about insider trading. "[D]ifficult and deliberative processes [were] designed to promote fair notice and the rule of law, ensuring the people would be subject to a relatively stable and predictable set of rules." *Gundy*, 139 S. Ct. at 2134 (Gorsuch, J. dissenting). Because complex policy interests have not been resolved through a legislative process, insider trading rules are far from "stable" or "predictable". Instead, case-by-case determination by judges who are confined to the specific facts before them have led to a law that Judge Rakoff accurately described as "topsy turvy." *United States. v. Whitman*, 904 F. Supp. 2d 372 (S.D.N.Y. 2012) (collecting cases and describing expansion of caselaw).

Whether complex or simple, Article I requires that any criminal prohibitions be defined by Congress. Congress itself has acknowledged this obligation by attempting three times to try to pass a law of insider trading. In urging passage of the latest insider trading bill in 2021, Congressman Jim Himes of Connecticut said:

> law is to be made in this Chamber, not in the chambers of unelected judges throughout the land. While [Congressman] Hill is correct that there has been a vast body of court-made law around insider trading developed over the generations, that is far from ideal, and, frankly, an abrogation of the legislative responsibilities of the United States Congress. So, we are where we are. . . . [I]t is, in fact, the elected legislators of this country and not the judges, as important as their role may be, who should determine what we consider wrong in statute and what we punish people for doing.

167 Cong. Rec. H2461 (daily ed. May 18, 2021) (statement of Rep. Himes urging passage of the Insider Trading Prohibition Act, HR 2655, 117th Cong. (2021).) He made this same point in 2019

when he urged passage of virtually the same insider trading law, H.R. 2534, 116th Cong. (2019). *See* 166 Cong. Rec. H9272 (daily ed. December 5, 2019) ("if we are going to create criminal or civil liability, the legislators of the Congress of the United States should make specific how and when and under what circumstances we do so.")   He had also proposed a nearly identical bill in 2015 in the wake of the *Newman* decision discussed below. *See* Insider Trading Prohibition Act, H.R. 1625, 114th Cong (2015).

All three efforts, pursued in the last decade alone, failed to yield any law.  Each time, the legislators were apparently unable to agree on the prohibition.  This should come as no surprise: the competing interests in information parity and that of market efficiency are not easily resolved. If the bill sought to ensure more equitable access to market information, some feared its impact on efficiency.  For example, Congressman Bill Huizenga from Michigan expressed concerns that the 2021 bill "could expand liability for good-faith traders, which would weaken investor confidence, chill vital information-gathering, and hurt the efficiency of our markets." 167 Cong. Rec. H2462 (daily ed. May 18, 2021) (statement of Rep. Huizenga).  He referred to the body of existing caselaw and noted that the SEC did not want Congress to legislate a law, and that the "bill could add more confusion and uncertainty around insider trading law with rogue judges and prosecutors using the language to expand the bounds of insider trading laws." *Id*.[3]

Congressman Himes responded: "We make the laws. We don't ask the regulators whether they would like us to, or whether they would cheer us on in making laws.  We make the laws.  If

---

[3] This deference to the SEC echoes discussions in the early 1980s, when the "SEC, preferring a case-by-case construction, has discouraged efforts by Congress to legislate the parameters of section 10(b) and insider trading." Carol B. Swanson, *Reinventing Insider Trading: The Supreme Court Misappropriates the Misappropriation Theory*, 32 Wake Forest L. Rev. 1157, 1167-68 (1997)(citing to Insider Trading Sanctions Act of 1983: Hearings on H.R. 559 Before the Subcomm. on Securities of the Senate Comm. on Banking, Housing and Urban Affairs, 98th Cong., 2d Sess. 1, 37 (Apr. 3, 1984) (statement of John Fedders, Director of the SEC's Division of Enforcement)).

we are going to send people to jail, if we are going to stop the confusion of judge-made law, let's do our job and pass this legislation." *Id*.

Neither his bill nor any other was enacted by Congress. The fact remains that despite diligent efforts by the legislative body, there is no statute making clear exactly what insider trading is and what conduct is prohibited. But as Justice Gorsuch explained, this failure to pass a law should not be viewed as unusual; to guard against an "excess of law-making", the process of legislation was designed to be difficult. *Gundy*, 139 S. Ct. at 2134 (Gorsuch J., dissenting). "Some occasionally complain about Article I's detailed and arduous processes for new legislation, but to the framers, these were bulwarks of liberty." *Id*.

To the extent some congressman, like Rep. Huizenga, may have simply preferred to avoid difficulty and defer to the SEC, the judiciary, or the Attorney General the function of defining the criminal law of insider trading, Article I will not permit it. As the *Gundy* case illustrates, even when Congress <u>expressly</u> chose to delegate to the executive branch, its authority barely passed constitutional muster. *Gundy's* plurality opinion held that Article I of the Constitution was not violated when Congress delegated to the Attorney General the power to determine the applicability of the federal Sex Offender Registration and Notification Act ("SORNA") to a person convicted of a sex offense prior to the enactment of SORNA. 139 S. Ct. at 2130. The three dissenters, including Chief Justice Roberts, would have held such delegation of power by Congress to be unconstitutional. Justice Kavanaugh took no part in the decision. One of the members of the plurality opinion, Justice Breyer, has since been replaced on the Court by Justice Barrett. And while Justice Alito concurred in the Court's decisions, he expressed concern that the Court's precedent regarding delegation of powers adopted "extraordinarily capacious standards," noting: "[i]f a majority of this Court were willing to reconsider the approach we have taken for the past 84

years, I would support that effort. But because the majority is not willing to do that, it would be freakish to single out the provision at issue here for special treatment." *Id.* at 2131. Had Justice Kavanaugh been able to participate in the deliberation and adjudication, Justice Alito may have found that willing majority, transforming Justice Gorsuch's dissent into the Court's holding.[4]

If *Gundy* was a plurality holding on a razor's edge, Article I's demand here is far more straightforward. Congress has not expressly agreed to delegate any power to the judiciary or the Attorney General to promulgate or define an insider trading law. As Congressman Himes rightly stated: Congress could not "abrogate[e its] legislative responsibility" even if it wanted to. No one responded to his invocation of Article I by claiming that existing statutes amply gave notice of insider trading prohibition nor did anyone call for a vote to expressly delegate to the other branches of government. Instead, Congress simply failed to reach agreement on a prohibition despite repeated efforts to do so. This, then, is an instance of the legislature trying in good faith, but failing, to pass a law; not a delegation or abrogation of its obligations.

In the absence of a congressional prohibition on insider trading, this Court should dismiss the Indictment as premised on judge-made criminal prohibition in violation of Article I.

### B. Securities Statutes As Applied to Insider Trading Are Void For Vagueness.

In the alternative, the Indictment, premised on Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. Section 78j(b)), its enabling Rule 10b-5 (17 C.F.R. Section 240.10b-5),[5]

---

[4] *See also Gundy*, *id.* at 2148 (Gorsuch, J. dissenting) ("In a future case with a full panel, I remain hopeful that the Court may yet recognize that, while Congress can enlist considerable assistance from the executive branch in filling up details and finding facts, it may never hand off to the nation's chief prosecutor the power to write his own criminal code. That 'is delegation running riot.'").

[5] Section 10(b) of the Exchange Act prohibits the use "in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." Pursuant to this section, the SEC promulgated Rule 10b-5, which provides in pertinent part: "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national

and/or 18 U.S.C. Section 1348[6] (*See* Ind. pp. 12-13), should be dismissed because the anti-fraud prohibitions in those statutes and rule are void for vagueness as applied to insider trading. Charges of conspiracy or aiding and abetting the underlying substantive violations must also be dismissed as a consequence.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The High Court has repeatedly cited to this doctrine as it reversed convictions based on overly broad interpretations of criminal statutes, in violation of the Due Process clause. *See e.g., McDonnell v. United States*, 136 S. Ct. 2355, 2373 (2016) (bribery law's "official act" language not defined "with sufficient definiteness that ordinary people can understand what conduct is prohibited."); *Skilling v. United States*, 561 U.S. 358, 402-03 (2010) (mail fraud's "honest services" is not void for vagueness as long as it is applied only to kickbacks and bribery); *Skilling*, 561 U.S. at 415-16 (Scalia, J., concurring) (statute should simply be stricken as unconstitutionally vague); *Johnson v. United States*, 135 S. Ct. 2551, 2555-

---

securities exchange, (a) To employ any device, scheme, or artifice to defraud, [or] ... (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

[6] In pertinent part, Section 1348 of Title 18 U.S.C. provides criminal penalties for anyone who "executes, or attempts to execute, any scheme or artifice -- (1) to defraud a person in connection with … any security of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15( d) of the Securities Exchange Act of 1934 …, or (b) to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of a security of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 … and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934…."

63 (2015) (gun law defining "violent felony" void for vagueness); *Sessions v. Dimaya*, 138 S. Ct. 1204, 1207 (2018) (immigration law requiring deportation of alien convicted of "aggravated felony" void for vagueness). *Cf. Ciminelli v. United States*, 598 U.S. 306 (2023) (reversing fraud convictions premised on deprivation of so-called "right to control" because "property" does not encompass such concept. Invalidating theory accepted by Second Circuit for 30 years); *Kelly v. United States*, 140 S. Ct. 1565 (2020) (reversing fraud conviction for over-broad interpretation of "obtaining money or property" language in fraud statutes).

Measured against these recent Supreme Court decisions, the statutes at issue come nowhere close to providing adequate notice of prohibitions on insider trading. Courts, beginning with *Chiarella*, have repeatedly stated the obvious: none of the securities statutes or Rule 10b-5 cited in the Indictment prohibits insider trading, *see supra*. at 7-8, and none of them mentions any of the elements or terms that lawyers and judges now only *generally* understand to constitute unlawful insider trading: namely, the purchase or sale of securities on the basis of material nonpublic information in violation of fiduciary or fiduciary-like duty. *See Salman v. United States*, 540 U.S. 420, 423 (2016); *United States v. Newman*, 773 F.3d 438, 450 (2d Cir. 2014). Those concepts all flow from judicial opinions adjudicating specific factual disputes between specific parties, not legislative decree publicly declared by a democratic body.

Nor do those judicial constructions flow naturally from the language of the existing securities statutes and rules. Far from it. "[O]pen-market insider trading is hard to see as deceptive (the insider trader communicates nothing false or misleading simply by submitting an anonymous bona fide order to buy or sell)." Langevoort, *Watching Insider Trading Law Wobble*, 89 Fordham L. Rev. at 510-511. Judges, SEC lawyers and prosecutors deemed the word "fraud" "sufficiently elastic to encompass it. Duties seemingly reach as far as need be to inspire investor faith in market

integrity." *Id.* This is not a conclusion a person of "ordinary intelligence" would or could inevitably reach upon reading the securities statutes or rules. Even legal scholars have had to closely examine the analytic bases for the prohibition in order to make sense of them and have found them wanting. *See, e.g.,* Barbara Bader Aldave, *Misappropriation: A General Theory of Liability for Trading on Nonpublic Information,* 13 Hofstra L. Rev. 101 (1984*)* ("The more one ponders the reasoning in *Chiarella v. United States* and *Dirks v. SEC*, the less one is satisfied with the Supreme Court's explanation of when and why Rule 10b-5 prohibits trading in securities on the basis of material nonpublic information.").[7]

The interpretive problems with the judge-made law were put on full display through the extraordinary conflicts within the Second Circuit in the past ten years as thoughtful judges disagreed on what conduct is prohibited. A unanimous panel in *United States v. Newman*, 773 F.3d 438 (2d Cir. 2014) reversed a conviction of tippees, and then a different, divided panel in *United States v. Martoma*, 869 F.3d 55 (2d Cir. 2017) ("*Martoma I*"), affirmed a conviction of a tippee, but then had to amend and supersede the opinion, 894 F.3d 64 (2d Cir. 2017) ("*Martoma II*"). In each opinion, the majority applied reasoning that Judge Pooler sharply criticized as flouting both the *Newman* decision issued just three years before and the seminal Supreme Court decision in *Dirks*. *See* 894 F.3d at 80-87. To add to the confusion, the Supreme Court denied the government's cert. petition in *Newman*, but later abrogated one part of the *Newman* decision in

---

[7] *See also,* Alison Grey Anderson, *Fraud, Fiduciaries, and Insider Trading*, 10 Hofstra L. Rev. 341, 376-77 (1982) (referring to *Chiarella*: "[t]his is not a Supreme Court construing a complicated federal statutory scheme with wisdom, craft, and candor; this is a first-year Torts class on a bad day."); Arthur B. Laby, *SEC v. Capital Gains Research Bureau and the Investment Advisers Act of 1940*, 91 B.U. L. Rev. 1051, 1088-89, 1095 (2011) (arguing that "[t]he law of insider trading is hardly an example of clarity, and its fiduciary foundation is unstable," and that the source and the contours of a "federal fiduciary duty" remain cloaked in ambiguity); A.C. Pritchard, *Insider Trading and the Ambiguous Quest for Edge,* 116 Mich. L. Rev. 945, 946 (2018) ("[T]he legal prohibition against insider dealing is beset by murky lines, the product of its essentially common law origins. Courts have made it up as they go along because Congress and the SEC have refused to define insider trading by statute or rule").

*Salman v. United States*, 850 U.S. 420 (2016). *See* Park, *Newman/Martoma: the Insider Trading Law's Impasse*, 25 Fordham J. of Corp. & Fin. Law, at 52-74 (detailing *Newman* and *Martoma* conflict and root causes).

In the wake of the *Newman* reversal, the government sought rehearing and rehearing *en banc*, telling the Second Circuit that the *Newman* decision was "deeply confounding" and "certain to engender confusion among market participants, parties, judges, and juries." Petition of the United States of America for Rehearing and Rehearing En Banc, *United States v. Newman*, 773 F.3d 438 (2d Cir. 2015) (No. 13-1837), 2015 WL 1064423, at *2. When relief was denied, the government appealed to the Supreme Court claiming that: "market participants and analysts who seek to comply with the law will lack clear guidance about the legal limits of their conduct," Petition for a Writ of Certiorari, *United States v. Newman*, No. 15-137 (U.S. July 30, 2015), 2015 WL 4572753, *33; that *Newman's* reading "blurs the line between legitimate and prohibited activity," Id. at *26 and creates "uncertainty in the financial community about the boundaries of legitimate conduct." Id at *32. The cert. petition was also denied. After *Martoma II*, it was the defense bar's turn to argue that the latest decision "creates great uncertainty in the  law of insider trading ...." Brief of N.Y.C. Council of Def. Law. and Nat'l Ass'n of Crim. Def. Law. as Amici Curiae in Support of Defendant- Appellant's Petition for Rehearing *En Banc* at 6, *United States v. Martoma,* 894 F.3d 64 (2d Cir. 2017) (No. 14-3599), 2018 WL 4075999.

Even before *Martoma*, in remarks to the city bar, Judge Engelmayer summarized the grave problems with the judge-made law, the policy sources of the problem and the need for Congress to act. Paul A. Engelmayer, Congress: U.S. Needs an Insider Trading Law, N.Y.L.J. (Oct. 23, 2015), www.law.com/newyorklawjournal/almID/1202740459962/. But it didn't and the confusion only got worse, with *Martoma* and through today. In *United States v. Blaszczak*, 947

F.3d 19 (2d Cir. 2019) ("*Blaszczak I*"), a divided panel affirmed insider trading and fraud convictions, holding, among other things, that 18 U.S.C Section 1348 does not require as an element that the defendant knew the insider was sharing material nonpublic information in exchange for a personal benefit, as is the case under Section 10(b) of the Exchange Act. After remand from the Supreme Court for a different aspect of the opinion having to do with the definition of "property", the Second Circuit corrected itself to reverse the convictions. *See United States v. Blaszczak*, 56 F.4th 230 (2d Cir. 2022) ("*Blaszczak II*").[8] While the remand and corrected opinion was exclusively focused on the meaning of the term "property," Judge Walker felt it necessary to issue a concurring opinion pointedly criticizing *Blaszczak I*'s "personal benefit" holding. *Id*. at 242 (Walker, J., concurring). To him, it made no sense that that element should be required for a Section 10(b) construction of insider trading but not Section 1348. Among other concerns, Judge Walker believed the new rule would risk impairing lawful market activity, which *Dirks* sought to protect. *Id*. at 250.

And so the policy-based disagreements within the judiciary between market efficiency and parity of information continue, unresolved. There are not enough pages in this legal brief or any other to describe all the twists and turns of the judicial efforts to wring an insider trading prohibition from the language of the existing statutes. Professor Langevoort is the latest scholar to try to encapsulate this history with a series of highlights, using Judge Rakoff's many expressions of concern about the law over the years as guideposts. Langevoort, *Watching Insider Trading Law*

---

[8] The defendants had objected to two legal issues: one pertaining to the requirements for insider trading under Section 1348 and the second pertaining to the meaning of "property" within the meaning of the fraud statutes. The Supreme Court remanded the case back to the Second Circuit with the government's consent in light of an intervening decision, *Kelly v. United States*, 140 S. Ct. 1565 (2020), which related solely to the definition of "property" in the context of government agencies. *See Olan v. United States*, 141 S.Ct. 1040 (2021). On remand, again in a divided opinion, the Second Circuit corrected itself to reverse the convictions on the basis of the *Kelly* decision. *Blaszczak II.*

*Wobble*, 89 Fordham L. Rev. 507. Even this study is now old, as it predated Judge Walker's more recent and trenchant concurring opinion in *Blaszczak II.*

As discussed *supra*, Congress itself openly acknowledges the confusing state of the judge made "law" of insider trading, appearing to place most of the blame on *Newman*. *See* 167 Cong. Rec. H2461-2 (Rep. Cleaver: "because there isn't a statutory definition of insider trading, there is uncertainty around who is subject to insider trading prohibitions"; Rep. Huizenga: this "bill could add <u>more</u> confusion and uncertainty around insider trading law"; Rep. Himes: "If we are going to send people to jail, if we are going to stop the confusion of judge-made law, let's do our job and pass this legislation." ).

At bottom, however, the confusion in the caselaw about what the law *should* be is immaterial. Under the Due Process Clause and Article I, what matters is what the <u>statutes</u> say. "The crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue." *Connolly v. Gen. Const. Co.,* 269 U.S. 385, 393 (1926). The many scholars and judges who have struggled with the judge-made insider trading concepts are far from "ordinary" or "person(s) of ordinary intelligence". *Grayned,* 408 U.S. at 108. Their persistent debates demonstrate the impossibility of any layperson discerning a clear insider trading prohibition from the plain words of the securities statutes and rule cited in the Indictment.[9]

Thus, as applied to any conduct viewed as trading on material nonpublic information, the statutes at issue (and Rule 10b-5) are void for vagueness, and the Indictment should be dismissed.

---

[9] Even if one could argue that some words could or might be read as prohibiting some version of what is commonly called insider trading, the rule of lenity would require that all terms be interpreted in favor of the defendant. *See Yates v. United States*, 135 107, 108 (2015)("ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.").

## II. THE COURT SHOULD SUPPRESS THE FRUITS OF ANY VIOLATION OF SIXTH AMENDMENT AND HOLD A HEARING TO DETERMINE THE FULL EXTENT OF THE MISCONDUCT INVOLVED IN PRE- AND POST-INDICTMENT CONTACT WITH REPRESENTED DEFENDANT.

Government representatives planted an informant in defendant Michael Shvartsman's camp to be appointed trustee for a trust associated with Mr. Shvartsman. This occurred after his counsel told the government of legal representation. Under government direction, this informant held a series of secretly recorded meetings with Mr. Shvartsman and Rocket One's in-house counsel, who was also Mr. Shvartsman's attorney on transactional matters. These meetings and calls began <u>before</u> Mr. Shvartsman was charged and arrested on the instant charges and persisted even <u>after</u> such charges. As to conduct post-indictment, Mr. Shvartsman's Sixth Amendment rights were violated and any and all statements and fruits thereof must be suppressed. As to pre-indictment conduct, the Court should hold an evidentiary hearing to determine whether the conduct qualifies as "egregious misconduct" and, if so, determine the appropriate remedy.

### A. Summary of Relevant Facts

Mr. Shvartsman and his company, Rocket One Capital LLC, received grand jury subpoenas issued from the Southern District of New York, in June of 2022. On June 24, 2022, attorney Robert Buschel contacted Assistant U.S. Attorney Nicholas Roos, one of the prosecutors in the case at bar, informing him of the receipt of the subpoenas (Park Dec. at ¶ 2 and 4). Shortly thereafter, Mr. Buschel followed up with an email to AUSA Roos and two of his colleagues confirming Rocket One's receipt of the subpoena and his representation of Mr. Shvartsman among others. (Park Dec. at ¶ 4, Ex. A).

Michael Park is an in-house counsel for RocketOne and counsel as well for Shvartsman on personal transactional matters. (Park Dec. at ¶ 9). In late 2022, an individual was introduced to Mr. Shvartsman as someone who could assist with asset protection structures, and he later offered

his services as a trustee of trusts that Mr. Shvartsman, his family, and his affiliated companies had established with the assistance of counsel. (Park Dec. at ¶ 5).

Based on review of discovery recently obtained from the government, it is now clear that this individual was then acting as a government informant, under the direction of the U.S. Department of Homeland Security ("DHS"). (The individual is referred to hereinafter as "the Informant"). Specifically, an Initial Report of Investigation ("ROI") prepared by DHS, and approved December 16, 2022, reflects that DHS was aware of the trading in DWAC securities and that the "investigation will be conducted to determine if SHVARTSMAN, and/or associates, conducted illicit financial transactions in relation to the proceeds from insider trading or any other criminal activity." (Park Dec. ¶ 5-6, Ex. B). On December 14, 2022, the Informant, equipped with a device to record conversations, met with Mr. Shvartsman at a Miami Airport hotel to discuss Shvartsman's interest in asset protection. (Park Dec. ¶ 7, Ex. C).

As reflected in an ROI of March 7, 2022, the government was carefully tracking the SEC's parallel investigation into insider trading in DWAC securities. (Park Dec. ¶ 8, Ex. D).

Subsequently, the Informant secretly recorded a meeting with Mr. Shvartsman and his counsel Michael Park at their offices in Aventura, Florida on March 15, 2023. (Park Dec. ¶ 9, Ex. E). During this meeting, there was substantial discussion regarding DWAC and Trump Media Group as reflected in a transcript of the recording, attached as Exhibit F to the Park Dec. At one point when Mr. Shvartsman left the room, the informant engaged Mr. Park, the attorney, in discussions regarding the DWAC events and Mr. Park's assessment of the investigation, impressions that he could only have derived from attorney client communications with Mr. Shvartsman. (Park Dec. ¶ 10). During this meeting, the Informant presented Mr. Shvartsman and Mr. Park with trust documents pursuant to which Informant would be formerly appointed trustee.

(Park Dec., Ex. E).

On April 13, 2023, Grant Smith, an attorney representing Mr. Shvartsman and RocketX, another company affiliated with Mr. Shvartsman, spoke with AUSA Michael Berger of the Southern District of Florida, to inquire about a subpoena that his office had served. In that conversation Mr. Smith informed the AUSA that he represented Michael Shvartsman and Rocket X. (Park Dec. at ¶ 11, Ex. G).

On April 28, 2023, the Informant met again with Shvartsman and Mr. Park at a restaurant in Miami. After the meeting, it appears the Informant dictated a summary of the meeting. According to that summary, the Informant asked Mr. Shvartsman "if there were any issues in relation to the SEC in any assets that we're going to be moving." (Park Dec. ¶ 12, Ex. H at p. 2, lines 9-12).

Two months later, on June 26, 2023, a federal grand jury in the Southern District of New York returned a sealed indictment against Mr. Shvartsman and his co-defendants, and on June 29, 2023, they were arrested, with the participation of the DHS agents handling the informant. (Park Dec. ¶ 13, Ex. I).

The government's covert insertion of their informant did not end with the formal charges.

On July 27, 2023, in his capacity as trustee, the Informant called Mr. Shvartsman and his in-house counsel, Mr. Park. He again inquired about the SEC investigation and Mr. Shvartsman explained that the assets he is seeking to protect do not relate to his insider trading arrest. (Park Dec. ¶ 14, Ex. J).

Thereafter, the Informant repeatedly initiated contact with Mr. Shvartsman in efforts to engage him in discussions to further the government's investigation, including purported efforts to secret insider trading proceeds. (Park Dec. at ¶ 15, Exs. K and L). They spoke at least on August 1, and 9, 2023, and had a lunch meeting in Bal Harbour, Florida on August 23, 2023. *Id*. During

October and November of 2023, the Informant sought to initiate further contact with Mr. Shvartsman through Michael Park. (Park Dec. ¶ 16, Ex. M).

The government has recently disclosed to the defense that it intends to supersede the Indictment to add money laundering charges against Mr. Shvartsman, on the theory that he sought to hide proceeds of insider trading in DWAC securities. (Park Dec. ¶ 17). The bases of these charges are not clear as the government filed a civil forfeiture complaint in Oklahoma alleging money laundering conduct that did not refer to the Informant activities. (Park Dec. ¶ 17, Ex. N).

### B. Sixth Amendment Violation

The right to counsel is "indispensable to the fair administration of our adversarial system of criminal justice." *Maine v. Moulton*, 474 U.S. 159, 168–69 (1985). The Sixth Amendment to the United States Constitution provides, in relevant part: "In all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence." The Sixth Amendment right to counsel attaches upon commencement of a prosecution. *United States v. Stein*, 541 F.3d 130, 152 (2d Cir. 2008).

> The Supreme Court has "pegged commencement [of a prosecution] to 'the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" "The rule is not 'mere formalism,' but a recognition of the point at which 'the government has committed itself to prosecute,' 'the adverse positions of government and defendant have solidified,' and the accused 'finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.'"

*Id.*, 541 F.3d at 152 (modifications in original) (internal and ending citations omitted). Once the Sixth Amendment right has attached, it "extends to all 'critical stages' of a criminal prosecution, including post-indictment interviews with law enforcement authorities." *United States v. Rommy*, 506 F.3d 108, 135 (2d Cir. 2007). Moreover, "the government may not use an undercover agent to circumvent the Sixth Amendment right to counsel once a suspect has been charged with the crime" and the Sixth Amendment otherwise "prevents the government from interfering with the accused's

right to counsel." *Illinois v. Perkins*, 496 U.S. 292, 299, 110 S. Ct. 2394, 2398–99, 110 L. Ed. 2d 243 (1990).

"Once the right [to counsel] has attached, the Sixth Amendment renders inadmissible in the Government's case-in-chief statements elicited by the Government outside the presence of a defendant's counsel that are not accompanied by a waiver of this right." *United States v. Barnaby*, No. 18-CR-33 (S-2) (NGG), 2021 WL 2895648, at *10 (E.D.N.Y. July 8, 2021) (*citing United States v. Yousef*, 327 F.3d 56, 140 (2d Cir. 2003)); *see also United States v. James*, 415 F. Supp. 2d 132, 156 (E.D.N.Y. 2006), *aff'd,* 712 F.3d 79 (2d Cir. 2013) ("The Sixth Amendment prohibits the government from interrogating or eliciting information in the absence of counsel once an individual has been indicted, and any statements made by the defendant to law enforcement officials are inadmissible unless they are shown to be the product of a voluntary, knowing and intelligent waiver of the defendant's Sixth Amendment rights.") (internal and ending citations omitted). This requirement serves "not as a remedy for a violation that has preceded trial but as a necessary incident of the constitutional right itself." *Michigan v. Harvey*, 494 U.S. 344, 362, 110 S. Ct. 1176, 1187, 108 L. Ed. 2d 293 (1990) (Stevens, J., dissenting).

In light of the government's persistent injection of its informant for communications with Mr. Shvartsman, even after the charges were filed, any and all statements obtained from Mr. Shvartsman and all fruits thereof must be suppressed. To the extent the government's forthcoming superseding indictment is premised in any way on any information learned during the course of post-indictment communications with Mr. Shvartsman, those charges will have to be dismissed.

## C. Violation of Ethical "No Contact" Rules

The Court should hold a hearing to determine the facts necessary to examine whether the **pre-indictment** contact with a represented party constitutes "egregious" governmental

misconduct, requiring suppression or some other sanction. As the Second Circuit held in *United States v. Hammad*, 858 F.2d 834, 839 (2d Cir. 1988):

> [t]he Constitution defines only the "minimal historic safeguards" which defendants must receive rather than the outer bounds of those we may afford them. *McNabb v. United States,* 318 U.S. 332, 340, 63 S.Ct. 608, 612, 87 L.Ed. 819 (1943). In other words, the Constitution prescribes a floor below which protections may not fall, rather than a ceiling beyond which they may not rise. The Model Code of Professional Responsibility, on the other hand, encompasses the attorney's duty "to maintain the highest standards of ethical conduct." Preamble, Model Code of Professional Responsibility (1981). The Code is designed to safeguard the integrity of the profession and preserve public confidence in our system of justice. It not only delineates an attorney's duties to the court, but defines his relationship with his client and adverse parties. Hence, the Code secures protections not contemplated by the Constitution.

*United States v. Hammad*, 858 F.2d 834, 839 (2d Cir. 1988). The Rules of Professional Conduct apply to federal prosecutors. *United States v. DeVillio*, 983 F.2d 1185, 1192 (2d Cir. 1993) ("This circuit conclusively established in *United States v. Jamil,* 707 F.2d 638, 645 (2d Cir.1983) that Disciplinary Rule 7–104(A)(1)[10] does apply to criminal prosecutions."). In its current form, Rule 4.2(a) of the Rules of Professional Conduct (titled "Communication With Person Represented by Counsel)" provides, in relevant part:

> In representing a client, a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the other lawyer or is authorized to do so by law.

This so-called "no contact" rule is also mandated by the Citizens Protection Act of 1988 (28 U.S.C. § 530B), which provides: "An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State."[11]

---

[10] Rule 7–104(A)(1) is the predecessor to the current New York Rule 4.2.

[11] 28 C.F.R. §77.3 also mandates: "In all criminal investigations and prosecutions . . ., attorneys for the government shall conform their conduct and activities to the state rules and laws, and federal local court

28 C.F.R. § 77.4(f) adds: "A Department attorney shall not direct an investigative agent acting under the attorney's supervision to engage in conduct under circumstances that would violate the attorney's obligations under section 530B." "Pursuant to the Protection Act, therefore, a prosecutor's failure to comply with the applicable no-contact rule is now also a violation of a federal statute. Moreover, the statute protects citizens' rights against attempts to circumvent them by federal prosecutors or other Government attorneys, thus implicating due process." *United States v. Koerber*, 966 F. Supp. 2d 1207, 1242 (D. Utah 2013).

If the government is found to have violated Rule 4.2, a court may exercise its discretion to exclude the resulting statements from evidence. *Hammad*, 858 F.2d at 842 ("we reject the government's effort to remove suppression from the arsenal of remedies available to district judges confronted with ethical violations."). While the pre-indictment government misconduct must admittedly be "egregious", *see United States v. Nouri*, 611 F. Supp. 2d 380, 385 (S.D.N.Y 2009), a case-by-case analysis is warranted. *Hammad*, 858 F.2d at 839. *See also United States v. Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991) ("if the government violates a protected right of the defendant, due process principles may bar the government from invoking the judicial process to obtain a conviction, [internal citation omitted], if the government's conduct 'reach[ed] a demonstrable level of outrageousness.'").

The Court cannot determine whether the egregiousness standard is satisfied in the absence of an evidentiary hearing. It is clear enough that the government was investigating potential

---

rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State, as these terms are defined in § 77.2 of this part." The Justice Department has even made clear obligations within the United States Attorney Manual ("USAM"). *See* USAM at Section 9-13.200 (titled "Communications with Represented Persons" and confirming "Department attorneys are governed in criminal and civil law enforcement investigations and proceedings by the relevant rule of professional conduct that deals with communications with represented persons. 28 U.S.C. Section 530B."), and available at https://www.justice.gov/jm/jm-9-13000-obtaining-evidence#9-13.200

criminal activity related to funds generated from the sale of DWAC securities (the very securities implicated in the instant insider trading prosecution). It is equally indisputable that the government sent in an informant to further this investigation against Mr. Shvartsman even after prosecutors in charge of the DWAC investigation were fully informed of the identity of defense counsel. And this was no ordinary informant: he presented himself as a trustee (presumably bound by fiduciary duties). He induced Mr. Shvartsman to engage him for those services. In this extraordinary capacity, the informant also drew in Mr. Shvartsman's personal and affiliated company's in-house counsel, Michael Park, to discuss the DWAC matter. In one meeting, when Mr. Shvartsman stepped away, the informant obtained confidential impressions of that attorney that could only have been derived from his discussions with his client, Mr. Shvartsman.

Moreover, after Mr. Shvartsman was indicted, the government did not even pause in violating the no contact rule. Their informant sought out more meetings just two days after preparing an investigative report on the Indictment in this case, and again attempted to inquire about the SEC investigation into DWAC. And those efforts continued right up to last month.

The government will undoubtedly assert their law enforcement objectives as a basis for ignoring the no contact rule. And, to be sure, since the Second Circuit's sharply worded, and eminently grounded, warning to the government in *Hammad*, none of the various incidents of governmental intrusions into defendants' rights have in fact yielded any adverse consequence to the government. But if *Hammad* and the disciplinary rules of professional conduct have any force at all in policing the ethical bounds of government lawyers when dealing with represented individuals, the conduct demonstrated here must at least trigger an evidentiary hearing so that the full details of their conduct may be examined. Sending an informant in to act as a trustee, to engage in the highly intrusive, deceptive, and persistent examination of a represented person, even

after he was indicted, is unprecedented and warrants a hearing.

### III. THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE GOVERNMENT MISLED THE GRAND JURY AS TO A SIGNIFICANT FACT; ALTERNATIVELY, THE GRAND JURY MATERIALS SHOULD BE DISCLOSED TO THE DEFENSE.

The government obtained an indictment in this insider trading case on the basis that defendant Bruce Garelick, a board member, tipped Michael Shvartsman of material nonpublic news about the potential merger with TMG. Key to that theory was its false claim that Mr. Garelick texted Mr. Shvartsman that he had "intelligence to share with you," shortly after which Mr. Shvartsman traded. Ind. ¶ 12(b). The government has since admitted the text had nothing to do with DWAC, but too late for the Grand Jury's consideration. This is misconduct warranting dismissal of the Indictment or, in the alternative, an examination of the grand jury presentation.

#### A. Legal Standard

"The grand jury serves the related purposes of investigating wrongdoing and protecting individuals from unfounded prosecutions." *United States v. Bari*, 750 F.2d 1169, 1176 (2d Cir. 1984). Within the grand jury context, the law of this Circuit is that dismissal of an indictment is warranted to achieve either of two objectives: to eliminate prejudice to the defendant or to prevent prosecutorial impairment of the grand jury's independent role. *United States v. Hogan,* 712 F.2d 757, 761 (2d Cir. 1983). Accordingly, the government may not approach grand jury proceedings with a "casual, 'anything goes' attitude." *United States v. Brito*, 907 F.2d 392, 395 (2d Cir.1990).

While the government is not obligated to present exculpatory evidence to the grand jury, *see, e.g.*, *United States v. Williams*, 504 U.S. 36, 51-52 (1992), it is nevertheless prohibited from misleading the grand jury with respect to essential facts. Pursuant to its "supervisory power, [the Court] may dismiss an indictment for prosecutorial misconduct if the grand jury was misled or misinformed" as to an essential fact. *United States v. Brito,* 907 F.2d at 394 (citation omitted); *see*

*also United States v. Fernandez*, No. 00 CR. 420 (SWK), 2000 WL 1409738, at *1 (S.D.N.Y. Sept. 22, 2000) (same) (citing *Brito*); *United States v. Ciambrone,* 601 F.2d 616, 623 (2d Cir. 1979) (government may not mislead grand jury); *United States v. Restrepo*, 547 Fed. Appx. 34, 44 (2d Cir. 2013) (standard for determining misconduct sufficient to warrant dismissal is whether the prosecutor's actions "amount to a 'knowing or reckless misleading of the grand jury as to an essential fact[.]'").

An indictment may be dismissed even when a prosecutor's errors were not purposeful. *See, e.g., United States v. Feurtado*, 191 F.3d 420, 424-25 (4th Cir. 1999) (court "took the correct course" in dismissing an indictment without prejudice after grand jury was influenced by unintentional prosecutorial misconduct); *United States v. Bravo-Fernandez*, 239 F. Supp. 3d 411, 415 (D.P.R. 2017) (finding particularized need for review because "grand jury was (through no wrongdoing by the government), misinstructed that it could return an indictment for conduct (a gratuity) that did not constitute a crime under the statute"). In addition, inaccurate responses to grand jury questions can warrant dismissal of an indictment. *See e.g.*, *United States v. Cerullo*, 2007 WL 2462111 (S.D.Ca. Aug. 28, 2007) (dismissing indictment because the prosecutor's answers to the grand jury's questions were inaccurate even though the prosecutor might not have had a duty to provide the information it did "absent a question from the grand jury"). Dismissal is ultimately proper "if it is established that the violation substantially influenced the grand jury's decision to indict," or if there is "grave doubt" that the decision to indict was free from the substantial influence of such violations. *Bank of Nova Scotia v. U.S.*, 487 U.S. 250, 256 (1988); *see also United States v. Carter*, 2005 WL 180914, at *5 S.D.N.Y. Jan 25, 2005) ("'[t]he prejudicial inquiry must focus on whether any violations had an effect on the grand jury's decision to indict'") (quoting *Bank of Nova Scotia, supra*).

In terms of access to grand jury materials, though matters occurring before the grand jury are "entitled to a presumption of secrecy," *United States v. Ulbricht*, 858 F.3d 71, 107 (2d Cir. 2017) (quotation marks omitted), the court may authorize disclosure … at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). The defendant can overcome the presumption of secrecy by showing a "particularized need that outweighs the need for secrecy" – that is, by showing that (1) "the material … is needed to avoid a possible injustice," (2) this need "is greater than the need for continued secrecy," and (3) the "request is structured to cover only material so needed." *Ulbricht*, 858 F.3d at 107 (quotation marks omitted), *abrogated on other grounds by Carpenter v. United States*, 138 S. Ct. 2206 (2017). "[A]s the considerations justifying secrecy become less relevant, a party asserting a need for grand jury transcripts will have a lesser burden in showing justification." *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 223 (1979).

**B. The Indictment Should be Dismissed.**

In this instance, the Indictment itself demonstrates the government presented false and misleading information that went to an essential fact. Specifically, the Indictment alleges:

> After DWAC executed a letter of intent with Trump Media on or around September 23, 2021, BRUCE GARELICK, the defendant, had several conversations with MICHAEL SHVARTSMAN, the defendant, in which he conveyed material non-public information to MICHAEL SHVARTSMAN and encouraged him to buy DWAC securities. The day after the letter of intent was signed, for instance, GARELICK texted MICHAEL SHVARTSMAN that he had "intelligence to share with you." GARELICK and MICHAEL SHVARTSMAN subsequently spoke, and on or about October 1, 2021, once DWAC warrants began trading on the Nasdaq exchange, MICHAEL SHVARTSMAN purchased 2,000,000 DWAC warrants over three days." (Ind. ¶ 12(b)).

The 2,000,000 DWAC warrants are the only allegedly improper purchases by Mr. Shvartsman contained within the Indictment. (Ind. ¶ 20).

Presumably, the members of the Grand Jury were led to believe that the "intelligence" discussed in the referenced text was related to DWAC and TMG, and that in that subsequent call, he shared material non-public information about a merger to Mr. Shvartsman that caused him to purchase 2,000,000 DWAC warrants on the public markets. But this suggestion was plainly false. The actual text reveals that the "intelligence" had nothing to do with DWAC or TMG but was instead tied to a conversation with an unrelated individual and a different business transaction:

> 10:53 AM: Bruce Garelick: I spoke with Steve at Altmore (guy that was supposed to be on the zoom at 10a.m) Have some good intelligence to share with you.

> 10:57 AM: Michael Shvartsman: Ok call you soon

(Park Dec at ¶ 19; Ex. O).

During the course of discovery, months after the indictment was returned, the government belatedly admitted to the defense that the text "may not have been in reference to information regarding DWAC." (Park Dec. at ¶ 20, Ex. P).  In falsely portraying this text to the Grand Jury, the government was either intentionally seeking to mislead the members or entirely reckless and cavalier with respect to their evidence.  Either way, the conduct is inexcusable.  The evidence had to have been influential to the Grand Jury since the quoted language was only one of two communications involving Mr. Shvartsman quoted in the entire Indictment.  The Indictment was thus materially tainted by the misleading presentation and should be dismissed.

**C.  In The Alternative Defendant Should be Provided Access to Grand Jury Materials.**

At a minimum, Defendant should be entitled to inspect the Grand Jury minutes and any related presentation of evidence concerning this "text" exchange and any of the referenced discussions between Mr. Garelick and Mr. Shvartsman to see how such information was presented to the Grand Jury.  The government's presentation of grossly misleading information before the grand jury, which they now admit was wrong, triggers the following pertinent questions:

- How did this happen? Was a full copy of the text exchange between the Defendants presented to the Grand Jury, only part of it, or did an agent simply characterize it?
- If the Grand Jury saw the whole text but returned that misleading Indictment anyway, were they fulfilling their required function?
- Did the Grand Jury have questions about that text exchange between the Defendants? If so, what were the answers that were provided?
- Did the Grand Jury inquire about the alleged discussions that followed? If so, how did the government representatives characterize those discussions?
- How did they respond to other related Grand Jury's inquiries, if any?
- What witness testimony, if any, was presented regarding the text message or the related discussions?

The Defendant has demonstrated a particularized, and factually based, as opposed to speculative, need for the requested Grand Jury minutes and materials. Moreover, and especially given that the request is narrow, the Defendant's "particularized need [is one] that outweighs the need for secrecy" [because] (1) 'the material … is needed to avoid a possible injustice,' (2) this need 'is greater than the need for continued secrecy,' and (3) the 'request is structured to cover only material so needed.'" *Ulbricht*, 858 F.3d at 107.

In the event the Court determines the defense has not established a right to examine the materials, we ask that the Court conduct its own *in camera* review of them to initially evaluate and address the circumstances and concerns raised herein.

## IV.  THE COURT SHOULD ORDER THE GOVERNMENT TO PROVIDE A BILL OF PARTICULARS

### A. Legal Standard

The United States Constitution requires that a defendant be provided with notice of the accusations he must answer. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation . . . ."). Moreover, Rule 7 of the Federal Rules of Criminal Procedure require, that an Indictment provide a "plain, concise and definite written statement of the essential facts constituting the offense charged".   An indictment that fails to plead all of the essential facts required to be proven beyond a reasonable

doubt must be dismissed for violation of the Fifth and Sixth Amendments. *See United States v. Pirro*, 212 F.3d 86, 95 (2d Cir. 2000) (affirming dismissal where the tax fraud indictment alleged that defendant made an omission without sufficiently pleading a duty to disclose). Moreover, the Sixth Amendment and "basic principles of fundamental fairness" require that the indictment apprise the defendant of the charges he must meet. *Russell v. United States*, 369 U.S. 749, 765 (1962).

To ensure that the defendant's rights to notice and defense guaranteed by the Fifth and Sixth Amendments are protected, a bill of particulars may be necessary. District courts have broad discretion to order the government to provide a bill of particulars. *See Will v. United States*, 389 U.S. 90, 98-99 (1967); *United States v. D'Amico*, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010). A motion for a bill of particulars should be granted where additional details of the charge are "necessary to the preparation of [the] defense, and to avoid prejudicial surprise at the trial." *United States v. Torres*, 910 F.2d 205, 234 (2d Cir. 1990) (quotation omitted); *see United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) ("Rule 7(f) . . . permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense."). The government must disclose information that is necessary for the defendant to prepare a defense against the government's charges, even if disclosure reveals the government's evidence or theories of the case. *United States v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1998).

Moreover, in resisting a bill of particulars, the "government may not 'rely solely on the quantity of information disclosed'; 'sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars.'" *United States v. Rajaratnam*, No. 09 CR. 1184 (RJH), 2010 WL 2788168, at *2 (S.D.N.Y. July 13, 2010) (collecting cases); *see also United States v. Nacchio*,

No. 05 CR 00545 EWN, 2006 WL 2475282, at *7 (D. Colo. Aug. 25, 2006) ("It is not sufficient simply to refer defense counsel to discovery. As the court noted in the March 24, 2006 hearing "[a]nyone who is familiar with the boxcar approach to discovery in civil cases knows that dumping vast quantities of documents and information on one's opposing party does not always elucidate what is going on, so that the [d]efendant can adequately prepare for trial.").

### B. A Bill of Particulars Must Identify Details of The Alleged MNPI.

In this case involving charges of insider trading and conspiracy, key details are missing from the Indictment and discovery produced. Most prominently, what information does the government contend is the material nonpublic information ("MNPI") that the defendants shared and/or traded on the basis of? As the district court in *Rajaratnam* reasoned:

> [T]his is an insider trading conspiracy case, which means the government must prove that the defendants conspired to acquire material nonpublic information. The merits of such a charge depend heavily on the facts and context. A defendant might argue that the information he sought to obtain was not material, or that it was already public at the time he tried to get it. But he can only do that if he knows what the information *is* and when it was conveyed.

*Rajaratnam,* 2010 WL 2788168 at *2 (emphasis in original). The Court ordered the government to specify "the substance of the information provided" and "the date(s) on which it was conveyed." *Rajartnam,* 2010 WL 2788168 at *4-9.

Recognizing the central importance of the information allegedly tipped, other courts have likewise required that the government provide factual particulars of the alleged MNPI. *See, e.g., United States v. Contorinis*, 09 Cr. 1083 (RJS), Order, Dkt No. 49 (S.D.N.Y. May 5, 2010) (directing government to "submit a bill of particulars with respect to the material, non-public information allegedly disclosed in connection with" a specified transaction); *Santoro*, 647 F. Supp. 153, 188 (E.D.N.Y. 1986) ("[A] defendant cannot be expected to defend against a charge of insider trading without knowing what the inside information is."), *rev'd by U.S. v. Davidoff,*

33

845 F.2d 1151 (2d Cir. 1988) (Second Circuit reversing insofar as trial court did not go far enough in ordering bill of particulars in RICO case).

Here, the Indictment is rife with references to MNPI in broad sweeping assertions (*see e.g.,* Ind. ¶¶ 10, 11, 12(b)), but provides none of the "essential facts" required by Rule 7. What specifically did co-defendant Garelick learn as a board member about the potential deal between DWAC and TMG that he allegedly tipped to Mr. Shvartsman? When did he learn them, and when and how were they shared with Mr. Shvartsman? Also, of this alleged MNPI, which MNPI is Mr. Shvartsman alleged to have traded on the basis of that the government contends was illegal? The Indictment also references nonpublic information about TMG that DWAC's CEO shared with Mr. Shvartsman and others (Ind. at ¶ 8), but is unclear whether this information constitutes MNPI and/or was the alleged basis for illegal trading by Mr. Shvartsman. The charges also claim that Mr. Shvartsman tipped others, without specifying what the MNPI was, when and how it was delivered, and to whom specifically.

Mr. Shvartsman is entitled to these particulars. *See Rajaratnam,* 2010 WL 2788168 at *2; *United States v. Falbo*, No. 92 CR. 0763 (PNL), 1993 WL 147441 (S.D.N.Y. Apr. 6, 1993) (granting motion for bill of particulars to the extent it requested the "material nonpublic information the government will contend that defendant(s) learned"); *see also United States v. Nacchio*, 05 Cr. 545, 2006 WL 2475282, at *3, *5-9 (D. Colo. Aug. 25, 2006) (discussing court's previous order that the government "identify 'all material nonpublic information that the Government claims [defendant] was aware of between December 4, 2000 and September 10, 2001.'"); *United States v. Santoro*, 647 F. Supp. 153, 188 (E.D.N.Y. 1986) (requiring government to "describe as specifically as possible" the insider information in question in response to indictment allegation that individual "supplied to his codefendants 'confidential, material,

nonpublic information relating (a) to the proposed merger of AEI and CF Air Freight in 1983….”),
reversed on other grounds by *United States v. Davidoff*, 845 F.2d 1151 (2d Cir. 1988).

### C.  A Bill of Particulars Must Identify Any Unindicted Co-Conspirators and Tippees.

The Indictment repeatedly refers to “others known and unknown” in connection with the
alleged insider trading conspiracy. (Ind. ¶¶ 16-17). The Indictment also alleges the defendants
“also passed DWAC’s confidential information to their friends and/or employees. . . .” (Ind.  ¶¶
3, 13).   While the Indictment mentions “Source Employee-1” and “Source Employee-2” as
allegedly tipped by G. Shvartsman (Counts 8 and 9), Michael Shvartsman’s neighbor as allegedly
tipped by Mr. Shvartsman (Count 5), and Michael Shvartsman’s friend (Count 7) and Michael
Shvartsman’s business associate (Count 6), as allegedly tipped by Mr. Shvartsman and Garelick,”
(Ind. ¶ 20), no additional information was provided in the Indictment about these individuals or
if the persons mentioned is everyone “known” to the government, and which ones are considered
to be co-conspirators, if any.  The Indictment also mentions the Chief Executive Officer (CEO)
of Benessere (Ind. ¶ 7) and “additional telephone calls” between that individual and Mr.
Shvartsman. (Ind. ¶ 8).  It is unclear, however, whether this CEO is considered an unindicted co-
conspirator. The government must provide this information.

Mr. Shvartsman is entitled to a bill of particulars that provide all such information. *See
United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 303 (S.D.N.Y 2018) (ordering “bill of
particulars as to the identities of unindicted co-conspirators” where conspiracy count “alleges
participation in a conspiracy ‘with others known and unknown’”).

## CONCLUSION

For all the foregoing reasons, the Court should grant Defendant Michael Shvartsman the relief sought herein.

Dated:  December 22, 2023

Respectfully submitted,

By:  /s/ TAI H. PARK
Tai H. Park

TAI PARK PLLC
1140 Avenue of the Americas, 17th Floor
New York, NY 10036
Tel: (917) 346-3914
tai@taiparklaw.com

*Counsel for Michael Shvartsman*