

500 Fifth Avenue, 40th Floor   New York, NY 10110
phone: 212-257-4880 | fax: 212-202-6417
www.shapiroarato.com

Alexandra A.E. Shapiro
ashapiro@shapiroarato.com
Direct: 212-257-4881

February 22, 2024

VIA ECF

Hon. Lewis J. Liman
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, New York 10007

    Re:    *United States v. Michael Shvartsman, et. al.*, No. 23 Cr. 307 (LJL)

Dear Judge Liman:

    Bruce Garelick respectfully submits this response to the government's post-hearing letter. As set forth below, (i) the government coerced Garelick to disclose his cell phone passcode and (ii) the government has forfeited its independent source and inevitable discovery arguments, which, in any event, fail on the merits.

    **I.**    **The Government Coerced Garelick Into Disclosing His Passcode**

    Imagine you've just arrived at customs following an overseas trip. It's New Year's Eve, and you have plans for the evening. Instead of being quickly waved through as usual, your passport is taken away, you are separated from your traveling companion, and you are detained for a "secondary inspection"—the purpose of which, you are eventually told, is to look for "child pornography," "human trafficking," or other "transnational crimes" committed while you were abroad. (Tr. 34:3-5, 80:25-81:8). A uniformed and armed border guard demands your cell phone and then "asks" you for the passcode. Would any ordinary person in this situation believe they had any choice about whether to comply? Obviously not. Most people assume the government has nearly unlimited power at the border—including the power to search electronic devices. And their assumption is correct. The CBP's own directive on border searches says "[t]ravelers *are obligated* to present electronic devices and the information contained therein in a condition that allows inspection of the device and its contents." (GX1, § 5.3.1 (emphasis added)). And the tear sheet that CBP Officer Gonzalez gave Garelick states that "[c]ollection of this information is mandatory." (GX2, p. 2). The traveler, moreover, is in detention, and it is "understood" that he is not free to leave. (Tr. 29:1-7). Indeed, the traveler is acutely aware that he can neither walk back onto the airplane, nor cross the border into his home country, until the CBP officials release him. It is thus perfectly reasonable for the traveler to believe that he is obligated to answer all questions and comply with all lawful requests by border officers, because he is. Indeed, it would be unreasonable to believe compliance was not mandatory.

Hon. Lewis J. Liman  
February 22, 2024

Page 2

    The evidence before the Court—including Gonzalez's testimony and Garelick's own affidavit, which Gonzalez corroborated in almost every respect—demonstrates that the government deliberately exploited a combination of deliberate deception and the inherently coercive environment of the border to force Garelick to surrender his passcode. This violated Garelick's Fifth Amendment rights.

    The secondary screening room to which Garelick was initially diverted was an environment calculated to secure compliance. *See United States v. Mendonca*, 88 F.4th 144, 164 (2d Cir. 2023) (noting relevance of "conditions of interrogation"). The room is 15-20 feet, separate from the public areas of the terminal, and it is "understood that you can't leave … until the inspection is over." (Tr. 26:20-21, 29:1-7; *see also* 79:19-21). Had Garelick tried to leave, the officer at the door "would [have] stop[ped] him." (Tr. 29:8-10). Garelick's passport had been taken away from him and was not returned to him until he departed approximately an hour and a half after he was first detained. (Tr. 81:9-11). Gonzalez was in uniform and visibly armed with a Glock 19. (Tr. 25:12-19, 26:2-3).

    The initial interrogation was at an elevated "judge counter." (Tr. 26:15-16, 60:7-8). When Garelick asked "Why am I here? What's going on?" Gonzalez "gave him a cover story" and told him "it's a routine inspection." (Tr. 62:16-22; Tr. 74:15). This was, of course, false. And contrary to the government's suggestion (Dkt. 86 at 3), Gonzalez admitted on cross-examination—and was unequivocal—that this question and answer occurred *before* Gonzalez "requested" Garelick's cell phone and the passcode. (Tr. 62:25-63:12, 74:10-18). Indeed, as Gonzalez testified, Garelick asked twice about the nature of the inspection: once "at the judge counter" and again "when the phone was taken." (Tr. 74:5-6). Both times Gonzalez gave a "cover story" and answered falsely to "put him at ease that it was a routine inspection." (Tr.62:16-24, 71:9-10, 74:14-18). Gonzalez also told Garelick that CBP was searching for child pornography and other transnational crime, but he claimed this occurred later, after Garelick had provided the passcode. (Tr. 34:2-5, 80:25-81:5).

    The circumstances in which Garelick surrendered his phone and passcode were even more coercive than the initial interrogation at the judge counter. After the initial questioning, Gonzalez directed Garelick to an "eight-by-ten room" often used to "fingerprint subjects." (Tr. 32:7-9). This inner room was connected to three other rooms: "an interview room, a pat-down room, and a cell." (Tr. 32:7-9). Gonzalez asked Garelick to take out his phone and unlock it. (Tr. 33:11-18). Garelick complied. (*Id.*). Gonzalez then asked Garelick for the passcode. (Tr. 33:20-21). Garelick again complied. (Tr. 33:22-24). Gonzalez locked the phone and gave it to Officer Apath, who was standing "next to" Gonzalez, close enough to overhear Gonzalez's conversation with Garelick. (Tr. 24:24-25, Tr. 34:16-20, 78:21-79:10).

    Any reasonable person in these circumstances—in a separate, inner room connected to others including a "cell," faced with two uniformed CBP officers—would feel that they had no option but to answer the CBP officer's questions and comply with his requests. Compliance is not voluntary when it is "no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968) (holding that consent to search was not valid where request for consent was accompanied by display of warrant). The government notes that Garelick "was not restrained, handcuffed, or told he could not leave the room" and claims that Gonzalez was following "his typical practice when on duty at JFK." (Dkt. 86 at 2). This doesn't

mean that Garelick's disclosure was voluntary. Moreover, even if similar facts wouldn't establish that an interrogation *at a police station* was coercive—which is far from clear[1]—a border screening is different. At the border, a traveler undergoing a "routine" screening assumes, correctly, that he must answer questions and comply with requests by border officials—otherwise his passport and phone will not be returned, and he will not be permitted to enter the country. It is a situation "instinct with coercion." *Bumper*, 391 U.S. at 550. As Garelick explained, he "felt pressure to cooperate with the agents and answer their questions so that they would let [him] go" and "would not have disclosed the password or answered the agents' questions if [he] had known that the government was conducting a criminal investigation[.]" (Dkt. 54 ¶¶ 11-12).

That Garelick is "a sophisticated, well-educated, middle-aged businessman" (Dkt. 86 at 2) does not make him less vulnerable to coercion. To the contrary, Garelick's inexperience with custodial environments supports a finding that he was coerced. As the Second Circuit recently found, while a defendant may be an "educated professional who appeared perfectly cogent," his "inexperience with the mechanics of the criminal justice system [may leave] him more vulnerable to police bluster and deception than other suspects." *Mendonca*, 88 F.4th at 169 n.21. And the evidence shows that Garelick was hardly as composed as the government tries to paint him. Gonzalez described Garelick as "a little bit confused at first about why it was happening to him." (Tr. 44:16-17, 62:14-15). And while he testified that Garelick was "calm [and] collected" (Tr. 36:1; *see also* Tr. 83:10), he also admitted that one of the supervisors decided that Garelick's girlfriend should be admitted to the secondary screening area to "appease him" and "help calm him" down (Tr. 41:20-23, Tr. 80:4-6).

Ultimately, the "most critical circumstance" bearing on coercion is the conduct of the interrogating officers. *Green v. Skully*, 850 F.2d 894, 902 (2d Cir. 1988); *accord United States v. Gavino*, 22 Cr. 136 (RPK), 2024 WL 85072, *8 (E.D.N.Y. Jan. 7, 2024). Indeed, the officials' conduct on its own may be a "sufficient condition to a finding of involuntariness." *Mendonca*, 88 F.4th at 164. As the hearing confirmed, the government deliberately hatched a plan to deceive Garelick so that he would provide his passcode—the passcode that the government has stipulated was necessary for the field extraction. (DX2 ¶¶ 3-4). The government describes Gonzalez's deliberate deceptions as "modest false reassurance." (Dkt. 86 at 4). This wasn't false reassurance: it was a cover story given in response to specific and pointed questions. But

---

[1] The government's assertion that the Second Circuit found nothing problematic about the police station interrogation in *Mendonca* (Dkt. 86 at 2) is untrue. The *Mendonca* defendant failed to create any district court record regarding the circumstances of his interrogation, requiring the Second Circuit to review his allegations of deception only for plain error and without any factfinding as to whether the allegedly deceptive statements attributed to the officers were actually false. 88 F.4th at 164-68. Even on this incomplete record, Judge Lynch, writing for court, observed that the case "present[ed] a troubling blend of ingredients that, at the very least, imperil voluntariness." *Id.* at 168. The court also pointed out that while nothing in the "'characteristics of the accused or the conditions of interrogation' [in *Green v. Skully*, 850 F.2d 894 (2d Cir. 1988)] gave us pause, we nonetheless remarked that the voluntariness of the defendant's confession was 'not free from doubt' based on 'troubling' police conduct [including misrepresentations] alone." *Id.* at 169 (quoting *Green*, 850 F.2d at 903)). The court also noted that "the circumstances … resemble those that other Circuits have determined to be sufficiently coercive to render a confession involuntary." *Id.* at 170. On plain error review, however, without a factual record, the court affirmed. *Id.*

an investigator may not "affirmatively misle[a]d [a suspect] as to the true nature of [an] investigation," *United States v. Okwumabua*, 828 F.2d 950, 953 (2d Cir. 1987), and "affirmative misrepresentations … may be sufficiently coercive to invalidate a suspect's waiver of the Fifth Amendment privilege." *United States v. Anderson*, 929 F.2d 96, 100 (2d Cir. 1991) (citing cases).

None of the cases the government cites supports its argument. *Illinois v. Perkins* held that *Miranda* warnings were not required when an undercover officer elicits incriminating statements from an incarcerated suspect. 496 U.S. 292, 300 (1990). As the Court explained, "the premise of *Miranda* [is] that the danger of coercion results from the interaction of custody and *official* interrogation." *Id.* at 297 (emphasis added). "[W]here a suspect does not know that he is conversing with a government agent," and has no reason to believe the officer has "official power over him," "these pressures do not exist." *Id.* Here, Garelick knew he was speaking with a "government agent" who had "official power over him." *Id.* That circumstance, combined with affirmative deception, gave rise to coercion.

The government's reliance on this Court's decision in *United States v. Disla Ramos*, 22 Cr. 431 (LJL), 2022 WL 17830637 (S.D.N.Y. Dec. 21, 2022), for the frightening proposition that police may even give "false legal advice" (Dkt. 86 at 4) is entirely misplaced. In *Disla Ramos*, the defendant argued that his *Miranda* waiver was coerced because he was falsely advised "that signing the form would indicate that [he] understood his rights, and not that [he] was waiving his rights." *Id.* at *25. This Court rejected the factual premise of the argument, finding that the agents read the defendant "the entire waiver … including the consent paragraph" and thus "partially correct[ed] their misrepresentation that the waiver only reflected [the defendant's] understanding of his Fifth Amendment rights." *Id.*

The government's reliance on *Gavino* is similarly misplaced. In *Gavino*, the court rejected the defendant's allegation that the CBP officer "engage[d] in coercive conduct by 'threat[ening] to deprive [him] of his'" cell phone if he did not give up his passcode. 2024 WL 85072, at *9. This argument failed because, while an unfounded threat may be coercive, all the agent had done was truthfully inform the defendant of what he intended—and was legally empowered—to do. *Id.* Similarly, in *United States v. Brewster*, the court rejected the argument that an agent had deceived the defendant by telling her that he "just wanted to talk" because the agent had in fact told the defendant that he had a warrant for her arrest. 19 Cr. 833 (SHS), 2021 WL 3423521, at *6 (S.D.N.Y. Aug. 5, 2021).

In this case, unlike in *Disla Ramos*, *Gavino*, and *Brewster*, the investigator misled Garelick, and did so in response to Garelick's specific request for information about the nature of the inspection. Combined with the coercive environment of the border, this resulted in compulsion that violated Garelick's Fifth Amendment rights.

## II. The Independent Source And Inevitable Discovery Exceptions Do Not Apply

As explained below and in Garelick's portion of the parties' January 31, 2024 joint letter (Dkt. 76 at 3), the government has waived any argument under the independent source and inevitable discovery exceptions by failing to raise those arguments in its opposition to Garelick's motion to suppress. However, even were the Court to address the government's newly formed and thinly supported independent source and inevitable discovery arguments, it should find that

the government has not carried its burden of showing that either exception applies. The December 2021 search warrant was the first warrant executed in this case. That search was the impetus for every subsequent warrant application and the touchstone for probable cause. And because the government's June 2022 search of Garelick's phone exploited the illegally obtained passcode, it cannot be considered independent.

> A. The Government Has Forfeited Its Independent Source And Inevitable Discovery Arguments

By failing to raise the exclusionary rule exceptions in its opposition to Garelick's motion, the government forfeited its right to rely on these arguments to resist suppression of the evidence. (*See* Dkt. 76 at 3). The prejudice from the government's failure to disclose the factual basis for its independent source and inevitable discovery arguments in advance of the hearing could not be clearer. The government first announced its intention to rely on these doctrines in an unsolicited sur-reply (Dkt. 74 at 1, n.1), but never, at any point before the hearing, articulated the factual basis for its independent source and inevitable discovery arguments. Instead of transparently disclosing its theory, the government was cagey, if not downright misleading, and its actions deprived Garelick of a fair opportunity to develop evidence at the hearing that would undermine the government's belated arguments. Specifically, the government led the defense to believe that Examiner Isolda would be its sole witness on inevitable discovery and insisted that Special Agent Troiano "[could not] offer relevant testimony as to the material issue for the evidentiary hearing." (Dkt. 77 at 5). The government also argued that the defense had no right to question Troiano about the sworn statements he made in support of the search warrants. (*Id.* at 3-4). Since the only issue the defense had raised about those statements related to Troiano's "false statement that the government did not know Garelick's passcode … which speaks for itself," the defense assumed there was no need to question Troiano about the search warrant affidavits. (Dkt. 79 at 2).[2] But now, in its post-hearing submission, the government relies on assertions in Troiano's warrant applications as the *only* basis for its independent source argument and the *primary* basis for its inevitable discovery argument. (Dkt. 86 at 5-7). This bait and switch cannot be squared with any notion of fair play.

The government bears the burden of establishing by a preponderance of the evidence that the independent source (or inevitable discovery) doctrine applies." *United States v. Mulholland*, 628 F. App'x 40, 43 (2d Cir. 2015). Accordingly, the government typically articulates the detailed basis for its independent source and/or inevitable discovery arguments in its opposition to a motion to suppress. (Dkt. 76 at 3) (citing examples). Had the government done so in its opposition, or even in its sur-reply (Dkt. 74), Garelick would, *at a minimum*, have cross-examined Troiano regarding his relevant statements. The government's gamesmanship should not be condoned, and the Court should find that the government has forfeited its independent source and inevitable discovery arguments.

Even if the Court does not find that the government has forfeited these arguments, it should find that the government has forfeited the right to rely on Troiano's statements. In its pre-

---

[2] We did reserve the right to call Troiano for a limited purpose related to the steps he took during execution of the June 2022 warrant (*see* Dkt. 79 at 1), but that turned out not to be necessary in light of Isolda's testimony.

hearing submission, the government did not just assert that Garelick had failed to articulate a basis to call Troiano—it represented that Troiano had *no* relevant testimony to give *at all*. (Dkt. 77 at 5). Without Troiano's statements the government's independent source and inevitable discovery arguments cannot succeed.

>   B. <u>The Independent Source And Inevitable Discovery Exceptions Do Not Apply To The June 2022 Forensic Examination Of Garelick's Cell Phone</u>

>       1. <u>Independent Source</u>

The government's independent source argument with respect to Garelick's cell phone fails (a) because the June 2022 search was conducted using Garelick's illegally obtained passcode, i.e., through exploitation of the illegality, and (b) because the government has not established that the June 2022 search was not prompted by the December 2021 search.

"The independent source doctrine 'allows admission of evidence that has been discovered by means *wholly independent* of any constitutional violation' because exclusion of such evidence would not serve the exclusionary rule's deterrent purpose." *United States v. Lauria*, 70 F.4th 106, 122 (2d Cir. 2023) (Raggi, J.) (emphasis added) (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)). In contrast, where the evidence is obtained through exploitation of the illegality, the independent source exception does not apply. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963). "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all." *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920) (Holmes, J.). Under the independent source doctrine, the government should neither "profit from its illegal activity" nor "be placed in a worse position than it would otherwise have occupied." *Murray v. United States*, 487 U.S. 533, 542 (1988).

Here, the government used Garelick's illegally obtained passcode to conduct the June 2022 extraction. Because the *search* was not independent of the Fifth Amendment violation, the independent source exception does not apply, regardless of whether the June 2022 warrant was the product of an independent source.

Even setting aside this threshold issue, the government must establish that the June 2022 warrant was itself independent. To do so, the government must prove not only (1) that the June 2022 warrant was "supported by probable cause derived from sources independent of" the illegality—which Garelick acknowledges—but also (2) that "the decision to seek the warrant [was not] prompted by information gleaned from the illegal conduct." *United States v. Johnson*, 994 F.2d 980, 987 (2d Cir. 1993); *Mulholland*, 628 F. App'x at 43; *United States v. Smith*, 22 Cr. 352, 2023 WL 3358357, at *11 (S.D.N.Y. May 11, 2023). This second prong is "more complex" than the first, *Johnson*, 994 F.2d at 987, and typically requires a well-developed factual record, *see Murray*, 487 U.S. at 543-44 (remanding for development of record on whether agents "would have sought a warrant if they had not earlier" searched illegally); *Mulholland*, 628 F. App'x at 43 (same).

The government has not met its burden on the second prong of the independent source inquiry. All the government offers on this prong is a single paragraph of Troiano's June 2022 warrant application. (Dkt. 86 at 6 (citing Shapiro Decl., Ex. 5 ¶ 15)). In that paragraph, Troiano

explains that the FBI did not fully extract Garelick's cell phone during the December 2021 border search and describes screenshots of several allegedly suspicious text messages taken during the border search. The government has waived any reliance on Troiano's statements (*see supra*, pp. 5-6), but even the paragraph it offers does not come close to meeting the government's burden of showing that the agents *would* have sought a search warrant in June 2022 even had they not searched illegally in December 2021. To the contrary, this paragraph, which primarily describes allegedly incriminating evidence discovered in December 2021, confirms that the June 2022 search *was* prompted by information gained during the manual search in December 2021.

2. Inevitable Discovery

The government's inevitable discovery argument fails at the threshold because the doctrine only applies when "the means by which the evidence would inevitably be discovered is independent from the means by which the evidence was actually—and unlawfully—discovered." *Lauria*, 70 F.4th at 123. Put differently, the court must determine, as in an independent source analysis, that the "investigation was not 'triggered or catalyzed'" by the illegal search. *In re 650 Fifth Avenue*, 830 F.3d 66, 103 (2d Cir. 2016). As described above, the government has not established that it would have sought the June 2022 warrant had the December 2021 search not taken place. The inevitable discovery argument fails for this reason alone.

Moreover, even if the government has established that the June 2022 warrant was not prompted by the December 2021 warrant, it has not established that the evidence "inevitably would have been discovered by lawful means." *Nix*, 467 U.S. at 444. "Proof of inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *650 Fifth Avenue*, 830 F.3d at 102 (quoting *United States v. Eng*, 971 F.3d 854, 859 (2d Cir. 1992)). The court must "view[] affairs as they existed at the instant before the unlawful search," and determine "what *would have happened* had the unlawful search never occurred." *Id.* The exception demands "'a high level of confidence that each of the contingencies required' for lawful inevitable discovery of the disputed evidence 'would in fact have occurred.'" *Lauria*, 70 F.4th at 123.

*Nix* exemplifies the showing the government needs to make. The defendant in *Nix* led law enforcement to the body of a 10-year old murder victim following an unlawful interrogation. 467 U.S. at 435-36. At the time, some 200 searchers were methodically searching "all roads, abandoned farm buildings, ditches, culverts, and any other place" where the body might have been hidden. *Id.* at 434-35. The searchers were within two and a half miles from the ditch where the child was located. *Id.* at 436. Based on these facts, it was clear that "the body inevitably would have been found." *Id.* at 449-50; *see also United States v. Whitehorn*, 829 F.2d 1225, 1231-32 (2d Cir. 1987) (inevitable discovery exception applied where FBI agents had "actually began the warrant application process over an hour before the warrantless 'bomb sweep' of defendant's apartment"). In contrast, in *Lauria*, the court held that the government had not established that it would inevitably have discovered certain cell site information merely by showing that it "lawfully *could have* obtained the evidence … or that it would have done so after the defense alerted it to defects in its initial affidavits." 70 F.4th at 124. Rather, "inevitable discovery asks whether the government has shown that it certainly *would have* discovered the evidence by a lawful means even if [the illegality had not occurred] or [been] challenged." *Id.*

Far from meeting its "obligation … of 'certitude,'" *650 Fifth Avenue*, 830 F.3d at 102, the government's inevitable discovery argument is a mish mash of speculation and inference.

Biometrics. The government asserts that, "[i]f biometrics had been required due to ignorance of the passcode, Isolda would have obtained the phone in a 'warm' state, maintained his access to the phone, and would have been able to obtain the same 'full file system' extraction of the device … no later than approximately a month following the seizure." (Dkt. 86 at 6). But that is not what Isolda testified to. Rather, Isolda testified that he has trained unspecified agents (not *these* agents) to use biometrics to unlock devices seized in a "warm" state and maintain them in an unlocked state. (Tr. 91:14-24). When, as in this case, the software does not at the time of seizure support the extraction of a phone without a passcode, it is his practice to maintain the phone in an unlocked state at the laboratory. (Tr. 92:3-9). Isolda was not at Garelick's home when the phone was seized (Tr. 98:1-3) and the Court has no reason to believe that this is what the seizing agent—Troiano (DX1)—would have done.

Moreover, as the government acknowledges, biometric unlock is only available if the phone is in a "warm" state—meaning it has already been unlocked using the passcode. (Dkt. 86 at 6 n.4; *see also* Tr. 100:11-20 (whether phone is "warm" or "cold" "significantly" impacts the FBI's ability to extract data)). Yet there was no testimony that the phone was even turned on, much less unlocked, when it was seized. Isolda acknowledged that there are several reasons why a phone may have been "cold" when seized, including if it was "off when it was first seized" or if there was a software update—hardly an infrequent occurrence—between the last unlock and the seizure. (Tr. 102:18-103:8). Garelick's phone was seized at 7:05 am (DX1), a time when phones may be especially prone to being "cold" from having been turned off the night before. And Isolda did not even note whether the phone was "warm" when it arrived at the laboratory— even though he acknowledged that this is important information and he has a practice of making such a notation. (Tr. 103:12-104:2). There is simply no "certitude" that if the government had not had the passcode, it would have been able to unlock the phone using biometrics.

Brute Force. The government has largely abandoned any argument that the phone could be unlocked using "brute force," and the record does not support the contention that brute force might render the unlocking of Garelick's cell phone "inevitable." Garelick's phone had a six digit passcode with a million possible combinations. (Tr. 108:16-20). The government concedes that "brute force" techniques may take "up to ten years" (Dkt. 86 at 6 n.4) and Isolda himself acknowledged significant uncertainty regarding how long a brute force extraction would take and even whether brute force would ever succeed (Tr. 105:8-109:25; *cf.* DX2 ¶ 5 (stipulated testimony of Examiner Slattery acknowledging that brute force "*might* have been possible with higher end tools available at the laboratory")).

Obtaining A Warrant To Force Garelick To Unlock His Phone Using His Passcode. The government also suggests that had all else failed it would have obtained a warrant to force Garelick to unlock his phone. (Dkt. 86 n.4). Perhaps such warrants would likely be issued by certain courts, e.g., courts in New Jersey, provided the government could show that Garelick's knowledge of the passcode was a foregone conclusion. (Dkt. 86 at 6 n.4, citing *State v. Andrews*, 234 A.3d 1254 (N.J. 2020)). But, as described in Garelick's reply brief, this is a profoundly unsettled area of law (Dkt. 69 at 3-7), and the issuance of such a warrant cannot be described as certain (or even likely). Indeed, even assuming that the foregone conclusion doctrine permits the

government to compel a suspect to enter (but not disclose) his passcode, courts are deeply split on whether that doctrine requires proof that the suspect knows his password or, as many courts hold, proof that the government can identify with reasonable particularity the incriminating documents on the device. *Compare, e.g.*, *In re Grand Jury Subpoena*, 670 F.3d 1335, 1345-46 (11th Cir. 2012) (government must prove knowledge of incriminating documents), and *Seo v. State*, 148 N.E.3d 952, 958 (Ind. 2020) (same), *with United States v. Smith*, --- F. Supp. 3d ---, 2023 WL 8611259, at*2-3 (S.D.N.Y. Dec. 13, 2023) (acknowledging disagreement with Eleventh Circuit and holding that proof that suspect knows the passcode is sufficient). Remarkably, while trying to convince this Court that issuance of a warrant to compel Garelick to decrypt his phone would be *inevitable*, the government cites no federal caselaw at all, let alone controlling Second Circuit precedent. An application for such a warrant would be no sure thing—which is presumably the real reason neither of the government's two warrant applications here included a request to compel Garelick to use his passcode to unlock his phone. Nor does the government provide any factual evidence to suggest that this was a plan it contemplated and would have pursued had Garelick's phone proven impossible to crack.

> C. The Independent Source Exception Does Not Apply To The Searches Of Garelick's iCloud And Google Accounts

The independent source exception also does not save the government's searches of Garelick's iCloud and Google accounts. As discussed above, it is not enough that the warrant be supported by independent probable cause; rather, the government must prove that "the decision to seek the warrant [was] not prompted by information gleaned from the illegal conduct." *Johnson*, 994 F.2d at 987.

The government again cites Troiano's statements in the supporting affidavits (Dkt. 86 at 7), but, as above, the government has waived any reliance on those statements. (*See supra*, pp. 5-6). In any event, Troiano's statements do not satisfy the government's burden: the section of each supporting affidavit alleging probable cause regarding the "subject accounts" begins with a multipage description of the execution of the December 2021 search warrant and of numerous the screenshots of Garelick's phone obtained during that search detailing messages exchanged between Garelick, Shvartsman, Orlando, and others. (Shapiro Decl., Ex. 6 ¶ 16, Ex. 9 ¶ 15). The investigation had, at this point, been going on for just a couple of months, and without testimony from any investigator, the Court has no basis to determine whether the investigation was steaming ahead, idling along, or somewhere in between. More importantly, without testimony from any investigators regarding their plans for the investigation the Court lacks a basis to find that the "investigation was not 'triggered or catalyzed'" by the illegal December 2021 search. *650 Fifth Avenue*, 830 F.3d at 103.

Respectfully submitted,

/s/ Alexandra A.E. Shapiro

Alexandra A.E. Shapiro
Jonathan P. Bach
Julian S. Brod

Hon. Lewis J. Liman
February 22, 2024

Page 10

cc: Counsel of Record (via ECF)